IMCO OIL & GAS COMPANY,
Appellant,

v.

MITCHELL ENERGY CORPORATION,
Appellee.

No. 2–95–056–CV.

Court of Appeals of Texas,
Fort Worth.

Dec. 14, 1995.

McLean & Sanders, and A. William Brackett, Fort Worth, for appellant.

Hughes & Luce, L.L.P., and R. Doak Bishop, William T. Reid, IV, Dallas, for appellee.

Before DAY, DAUPHINOT and RICHARDS, JJ.

## OPINION

DAY, Justice.

This is a contract dispute involving a preferential right provision contained in an oil and gas operating agreement. The trial court granted summary judgment in favor of appellee. We affirm.

### FACTUAL BACKGROUND

The facts of this dispute are complicated and involve operating agreements covering the Lassater Field, located in Marion County, Texas. Before May 21, 1971, Mobil Oil Company (Mobil), Texaco Incorporated (Texaco), and Getty Oil Company (Getty) were the primary owners in the mineral rights in the Lassater Field. An operating agreement dated August 25, 1945 (the 1945 Operating Agreement) between the predecessors of Mobil, Texaco, and Getty governed the operations at all depths in the field. The 1945 Operating Agreement contained a preferential-right provision, which gave each party an option to buy any interest that another party sought to sell.

In 1971, Westland Oil Development Corporation (Westland) sought to drill a well in exchange for part ownership in a particular vertical formation of the Lassater Field (the Deep Rights). Westland negotiated agreements with Mobil and Getty to earn by

"farmout," and with Texaco through a contingent "sublease," the Deep Rights in return for drilling the well. The farmout agreement between Mobil and Westland expressly bound Westland to execute a form operating agreement, which was attached as Exhibit II to the farmout agreement, should Westland earn the assignment. The farmout agreement was expressly made subject to the previous operating agreements, including the 1945 Operating Agreement, between Mobil, Getty, and Texaco.

Westland drilled a successful well and earned the assignments from Mobil and Getty. Westland never fulfilled the more stringent earning requirements under the Texaco sublease agreement.

Under the Mobil farmout agreement, Mobil and Westland executed a joint operating agreement on March 6, 1972 (1972 Operating Agreement) that was virtually identical to Exhibit II of the Mobil farmout agreement, except for the parties named on the signature page. Exhibit II only listed Mobil and Westland as parties, whereas the 1972 Operating Agreement also named Texaco, Getty, and four individuals who owned small interests in the Lassater Field. Signature blanks and acknowledgement forms were provided for these other entities. Exhibit II and the 1972 Operating Agreement contained identical preferential-right provisions. Neither Texaco, Getty, nor any of the four individuals ever signed the 1972 Operating Agreement. The present case rests entirely upon this omission.

Westland assigned an overriding royalty interest to its then-president, L.C. Kung, on June 26, 1972,[1] after it executed the 1972 Operating Agreement and received the assignment from Mobil on March 6, 1972. The overriding royalty interest from Westland to Kung referenced the two assignments Westland received from Mobil and Getty.

In January 1993, Mobil sold its interest to Mitchell Energy Corporation (Mitchell). Before closing the sale with Mitchell, Mobil first offered its interest in the Deep Rights to Texaco in accordance with the preferential-rights provision contained in the 1945 Operating Agreement. After Texaco declined, Mobil then offered Westland the option to exercise its preferential right under the 1972 Operating Agreement. Westland declined, and Mitchell bought Mobil's interest in the Deep Rights.

In October 1993, IMCO Oil & Gas Company (IMCO) entered into a preliminary letter agreement with Westland to purchase Westland's and Kung's interests in the Deep Rights. The letter agreement included a provision that it was subject to the receipt of all necessary waivers that may be required under any lease, operating agreement, or other agreement. Before consummating the letter agreement, Westland offered to Mitchell the option to exercise its preferential right under the 1972 Operating Agreement, but also sought to have Mitchell waive its preferential right. Mitchell exercised its right, however, and bought the interests on the same terms as offered by IMCO. Westland then terminated the letter agreement with IMCO because it was unable to obtain a waiver of Mitchell's preferential right under the 1972 Operating Agreement. IMCO filed suit against Mitchell, alleging tortious interference with contract and seeking specific performance.

The trial court appointed, with the consent of the parties, a Master in Chancery. After a hearing, the Master concluded that the 1972 Operating Agreement was binding as to Mobil and Westland, and that Mitchell, as Mobil's assignee, had a preferential right to purchase both Westland's and Kung's interests. After another hearing, the trial court confirmed the Master's Recommended Findings of Fact and Conclusions of Law and granted Mitchell summary judgment on all of IMCO's claims.

## DISCUSSION

### Points of Error

IMCO asserts in its first point of error that the trial court erred in granting Mitch-

---

[1]. Although the last line of the granting instrument states it was executed on June 26, 1971, we agree with the findings of the trial court that the instrument was actually executed on June 26, 1972, because the notary acknowledgment reflects 1972, as well as the body of the instrument expressly references the assignments to Westland in 1972 from Mobil and Getty. The 1971 date is clearly a typographical error.

ell's motion for summary judgment. In point of error two, IMCO argues that it was entitled to partial summary judgment on the issue that the assignment of the overriding interest to L.C. Kung was not subject to any preferential rights. IMCO argues in its third point of error that the trial court erred in confirming the Master's report. Because all of IMCO's points of error are related and depend on whether summary judgment for Mitchell was proper, we will address all three points together.

### Standard of Review

■ In a summary judgment case, the issue on appeal is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that movant is entitled to judgment as a matter of law. *See* Tex.R.Civ.P. 166a(c); *Cate v. Dover Corp.,* 790 S.W.2d 559, 562 (Tex.1990); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex. 1979). The burden of proof is on the movant, *Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 301–02 (Tex.1990), and all doubts about the existence of a genuine issue to a material fact are resolved against movant. *Cate,* 790 S.W.2d at 562; *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex.1965). Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant. *Great Am.,* 391 S.W.2d at 47.

■ In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence will be disregarded and the evidence favorable to the nonmovant will be accepted as true. *Harwell v. State Farm Mut. Auto Ins. Co.,* 896 S.W.2d 170, 173 (Tex.1995); *Montgomery v. Kennedy,* 669 S.W.2d 309, 311 (Tex.1984). Evidence that favors the movant's position will not be considered unless it is uncontroverted. *Great Am.,* 391 S.W.2d at 47. The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of movant's cause of action or defense as a matter of law. *City of Houston,* 589 S.W.2d at 678.

### Operating Agreements Not Inconsistent

■ The basis of IMCO's position is that the 1972 Operating Agreement was ineffective, and IMCO raises several different arguments as reasons for the agreement's ineffectiveness. IMCO argues that the 1972 Operating Agreement signed by Mobil and Westland could not be valid because its terms are inconsistent with the 1945 Operating Agreement executed by Mobil, Getty, and Texaco. The 1972 Operating Agreement, therefore, cannot subsist with the 1945 Operating Agreement. We hold that the 1972 Operating Agreement is not inconsistent with the 1945 Operating Agreement.

IMCO points to the 1972 Operating Agreement's designation of Westland as operator for the Deep Rights as conflicting with the 1945 Operating Agreement's designation of Mobil as the operator for the Lassater Field. However, we find that Mobil named Westland as the operator to the Deep Rights as between them; yet, Mobil remained responsible by the terms of the 1945 Agreement to Getty and Texaco for any actions that Westland took as operator under the 1972 Agreement. The mere naming of Westland as operator, as between Mobil and Westland, is no different from Mobil hiring an independent contractor and did not relieve Mobil of its responsibilities to Getty and Texaco, but instead only created additional duties and responsibilities as between Mobil and Westland.

Regarding the effect of the preferential rights provision of the 1972 Operating Agreement, it is clear that in the event Mobil wished to sell any rights it owned, Mobil first would have to offer Texaco and Getty, as parties to the 1945 Agreement, the option to exercise preferential rights. Provided they declined, Mobil would then be obligated to offer the option to Westland under the 1972 Agreement. Indeed, it was through this sequence that Mitchell acquired Mobil's interest. Mobil first offered Texaco (who had already acquired Getty's interest) the option under the 1945 Agreement, and upon Texaco's refusal, offered Westland the option to exercise its preferential right under the 1972 Agreement. When Texaco and Westland waived their rights, Mitchell acquired Mobil's

interest. It is clear, then, that the two agreements co-existed with no substantial inconsistencies which would affect the 1972 Agreement's validity as between Mobil and Westland.

### Intent of the Parties

■ IMCO primarily relies upon its argument that the 1972 Operating Agreement could not be valid because it contained signature blanks for all of the interest owners and only Westland and Mobil executed it. Thus, a condition precedent existed that all the listed parties must sign before the agreement could become valid. We disagree.

This issue rests on a determination of the intent of the parties. In this regard, two questions must be answered: (1) was the 1972 Operating Agreement intended to become effective only upon execution by all the parties for which signature blanks were provided; and (2) was it Mobil and Westland's intention to be bound by the terms of the 1972 Operating Agreement?

■ To answer the first inquiry, it should be remembered that the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Gracia v. RC Cola–7–Up Bottling Co.,* 667 S.W.2d 517, 520 (Tex.1984). Additionally, the court is required to construe the contract in a manner that would give effect to the parties' intentions as revealed by the language used in the contract. *General Fin. Servs., Inc. v. Practice Place, Inc.,* 897 S.W.2d 516, 522 (Tex.App.—Fort Worth 1995, no writ) (op. on reh'g). The language of the 1972 Operating Agreement expressly states at the beginning, "THIS AGREEMENT, entered into this 6th day of March, 1972, between Westland Oil Development Corp., hereafter designated as 'Operator', and the *signatory* parties other than Operator." [Emphasis added.] This language expressly indicates the agreement is between those who choose to sign the document, and we find that this language modifies the use of the word "parties" throughout the remainder of the document to those who actually sign the agreement. The very language of the 1972 Agreement does not manifest an intent to create a condition precedent; on the contrary, the express language of the agreement negates such a proposition. We disagree with IMCO that the mere existence of multiple-party signature lines and the reference to all of the "parties" indicate a requirement that the document will not become effective until signed by all the parties for whom signature lines are provided. We note that IMCO has not referred us to any Texas authority involving multiple-party signature blanks, and we have found none. We believe the appropriate rule to apply was thoroughly discussed in *Skinner v. Haugseth,* 426 So.2d 1127 (Fla.Dist.Ct.App.1983), where the court analyzed the views in several jurisdictions and held that a contract not signed by all of the parties will be valid unless the nature or the wording of the contract indicates a condition precedent is intended. *Id.* at 1131.

Further, IMCO is not a *party,* either signed or unsigned, to the 1972 Operating Agreement. The present case is not a situation where a signed party is attempting to hold an unsigned party liable under the contract, or vice versa. Instead, IMCO is a complete stranger to the contract attempting to impose an implied condition precedent and arguing what the parties intended, in spite of the express language of the document. We find that the 1972 Operating Agreement did not contain any condition precedent and was intended to become binding among those parties who actually chose to sign it.

■ The second inquiry also involves the intent of the parties, but specifically in the context of determining whether it was the intention of the signatory parties, Mobil and Westland, to be bound by the terms of the 1972 Agreement. IMCO argues that summary judgment was not proper because a determination of intent is a fact issue. While intent is usually a fact question, an issue which is normally a question of fact can be proved so conclusively by evidence that it becomes a matter of law. *Dixon v. Southwestern Bell Tel. Co.,* 607 S.W.2d 240, 242 (Tex.1980). To be entitled to summary judgment, it was incumbent upon Mitchell to establish Mobil and Westland's intent as a matter of law; the evidence offered must prove the existence of the fact such that reasonable minds cannot differ on the conclusion to be drawn from the evidence. *Triton Oil & Gas Corp. v. Marine Contractors &*

*Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982); *City of Dallas v. Half Price Books, Records, Magazines, Inc.,* 883 S.W.2d 374, 376 (Tex. App.—Dallas 1994, no writ). We hold that Mitchell met this burden.

The evidence presented to the trial court showed that Mobil, Westland, and Mitchell consistently acted in accordance with the 1972 Operating Agreement from the moment of its execution. Mitchell offered uncontradicted affidavits from Mobil and Westland that it was the intent of each of the parties to be bound by the agreement, regardless of whether other parties signed it.

 Additionally, the conduct of the parties which indicates the construction that the parties themselves placed on the contract may be considered as evidence of their true intent. *See Consolidated Eng'g Co. v. Southern Steel Co.,* 699 S.W.2d 188, 192–93 (Tex. 1985). As mentioned above, when Mitchell acquired Mobil's interest, the terms of the 1972 Operating Agreement were complied with. The 1972 Agreement was complied with when Mitchell offered Westland the option to exercise Westland's right as operator to drill a proposed well before Mitchell undertook to do so. Also, within the factual background of the present case, when IMCO approached Westland with a purchase offer, Westland, acting under the obligations of the 1972 Operating Agreement, first offered its interest to Mitchell.

We hold that in light of the evidence before the court, reasonable minds cannot differ on the conclusion to be drawn, that Westland and Mobil intended to be bound by the 1972 Operating Agreement. This was the conclusion reached by the Master and confirmed by the trial court. Summary judgment for Mitchell was proper, and the trial court did not err in either confirming the Master's report or granting summary judgment for Mitchell. IMCO's points of error one and three are overruled.

IMCO claims, in support of its second point of error, that the override royalty granted to L.C. Kung was not subject to the 1972 Operating Agreement and, therefore, was not subject to any preferential rights provision found in the agreement. L.C. Kung was granted an overriding royalty interest by Westland on June 26, 1972. The very terms of the 1972 Operating Agreement expressly provided that any overriding royalty interest created by a party would be subject to the terms of the agreement. As an assignee of Westland, therefore, the Kung override was subject to the preferential-right provision of the 1972 Operating Agreement. The trial court did not err in either denying IMCO partial summary judgment or confirming the Master's report on this point. IMCO's point of error two is overruled.

## CONCLUSION

We hold that the 1972 Operating Agreement did not conflict with the terms of the 1945 Operating Agreement, and was not invalid merely because all potentially contemplated parties did not sign it. The agreement was effective and binding as between Mobil and Westland and, therefore, as between Westland and Mitchell, as Mobil's successor. We also hold that the overriding royalty interest granted to L.C. Kung was subject to the terms of the 1972 Operating Agreement, including the preferential-right provision. Mitchell established as a matter of law that no material fact issue existed in this case; therefore, summary judgment was proper.

The judgment of the trial court is affirmed.