NO. 07-05-0007-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

SEPTEMBER 11, 2006
_____

CHESAPEAKE OPERATING, INC. and CHESAPEAKE PANHANDLE
LIMITED PARTNERSHIP,

Appellants

v.

LILLIAN BOND DENSON,

Appellee
_____

FROM THE 69TH DISTRICT COURT OF MOORE COUNTY;

NO. 98-33; HON. RONALD ENNS, PRESIDING
_____

***Opinion***
_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Chesapeake Operating, Inc. and Chesapeake Panhandle Limited Partnership

(collectively referred to as Chesapeake) appeal from a judgment entered in favor of Lillian

Bond Denson.[1] Through that document, the trial court construed a division order, declared

the rights of the parties under that order, and awarded damages. Two issues are pending

_____

[1]Actually, judgment was entered in favor of Frost National Bank, as trustee for the Lillian B. Denson Trust. However, after the trial court entered judgment, Denson was allowed to substitute for Frost National Bank, as trustee.

before us.  They involve the trial court's construction of paragraph "Fourth" of division orders executed by the predecessors-in-interest of both Chesapeake and Denson.  We modify the judgment of the trial court and affirm it as modified.

*Background*

Denson stood as a royalty interest owner and Chesapeake stood as the lessee and operator under the mineral lease encompassed by the division orders to which we previously alluded.  Their predecessors-in-interest, who executed the orders were J.T. Sneed, Jr., and Texoma Natural Gas Company (Texoma), respectively.  Next, the paragraph in question (entitled "Fourth") read:

> It is understood that at this time you are subject to and are paying an occupation or production tax of two per cent (2%) of the market value of gas produced and saved.  If hereafter there shall be any increase in the amount of said tax, or there shall be levied any new occupation, production, severance or other excise tax, one-eighth (1/8) of such increase shall be deducted from the above agreed royalty value of the gas which is then applicable.[2]

According to Denson, this provision obligated Texoma, and now Chesapeake, to pay all of the first two per cent of any occupation, production, severance, or excise tax resulting from the production and sale of gas from the premises. Chesapeake disagreed.  It argued that because statute now obligated royalty interest owners as well as lessees and operators to pay their *pro rata* share of the tax, it need only pay its *pro rata* share (as opposed to all) of the first two per cent.  The trial court sided with Denson, and this appeal followed.

---

[2]No one questions that the provision became part of the underlying mineral lease.  This occurred per the proviso in the division orders stating that to the extent the order "cover[ed] matters not included in the above mentioned leasehold, and insofar as it cover[ed] matter not dealt with therein, [it] constitute[d] an amendment of said lease."

*Issue One – Who Pays the First 2%*

To determine whether the trial court erred in requiring Chesapeake to pay the first 2% of the tax, we must construe paragraph "Fourth." In doing so, we initially note that no one contends the order or paragraph was ambiguous. Nor do we find it so. Its provisions lead only to one reasonable meaning. *See J. M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex. 2003) (stating that a contract is ambiguous if its terms can be afforded two reasonable yet conflicting interpretations). Consequently, our construction of the order involves a question of law. *Cross Timbers Oil Co. v. Exxon Corp.,* 22 S.W.3d 24, 26 (Tex. App.–Amarillo 2000, no pet.) (holding that the construction of an unambiguous contract is a question of law); *Borders v. KRLB, Inc.,* 727 S.W.2d 357, 359 (Tex. App.–Amarillo 1987, writ ref'd n.r.e.) (stating similarly).

Next, we must strive to give effect to the parties' intent, as garnered from the language used in the writing when read as a whole. *Cross Timbers Oil Co. v. Exxon Corporation,* 22 S.W.3d at 26. Precedent further requires us to afford the words used by the parties their plain, ordinary, and generally accepted meaning, unless the instrument requires otherwise. *Sun Operating Partnership, Ltd. v. Holt,* 984 S.W.2d 277, 285 (Tex. App.–Amarillo 1998, pet. denied); *Phillips Petroleum Co. v. Gillman,* 593 S.W.2d 152, 154 (Tex. Civ. App.–Amarillo 1980, writ ref'd n.r.e.). Authority similarly prohibits us from rewriting the instrument to say something it does not. *Borders v. KRLB, Inc.,* 727 S.W.2d at 359. Thus, we cannot disregard what the parties intended simply because one comes to dislike its terms or thinks that something else is needed. *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 888-89 (Tex. 1998). In other words, the parties to the instrument have

3

the freedom to select what terms and provisions to include before executing it. Because they strike the deal they choose and voluntarily bind themselves in the manner they opt, we generally cannot interfere with their decision. To do so would be to undermine not only the sanctity afforded their agreement but also the freedom given them to reach it. With this said, we turn to the paragraph "Fourth."

One reading the provision immediately sees that Texoma paid an occupation or production tax of 2% on the market value of the gas extracted. This liability of Texoma was "understood" by Sneed. Moreover, nothing was said of Sneed being obligated to pay same or any part of it. Yet, in the ensuing sentence, the parties to the order considered the likelihood of an "increase in the amount of said tax" or the levy of a "new occupation, production, severance or other excise tax." In providing for that likelihood, it was agreed that "one-eighth (1/8) of *such increase* shall be deducted from the above agreed royalty value of the gas which is then applicable." (Emphasis added). Reading the phrase "such increase" in context, we see that it referred to a rise in the tax or taxes then being levied upon the gas produced and sold from the lease. And, when that increase came into existence, one-eighth of it would be paid by Sneed through a deduction from the royalty due him. So, in effect, what the parties did was agree among themselves that the interest of the royalty owner, *i.e.* Sneed then and Denson now*,* would be reduced for the purpose of paying any occupation, production, severance or like tax on the gas when the amount of that tax exceeded two percent of the market value of the gas. And, if the royalty payment due the royalty owner was not affected by the change until it exceeded two percent, then, logically, Texoma, and its successors-in-interest (*i.e.* Chesapeake), were saddled with the obligation of paying the first two percent.

4

We acknowledge Chesapeake's contention that, at the time the division orders were signed, only the "producers" were obligated to pay the tax and royalty owners were not "producers." So too do we acknowledge the contention that the group of entities now statutorily responsible for assuring payment of the tax includes royalty interest owners. Yet, the statutory changes do not relieve us from attempting to enforce the original intent of the parties to the agreement. This is so because such changes cannot operate retroactively to deny individuals of previously vested rights. *Ex parte Abell*, 613 S.W.2d 255, 260 (Tex. 1981). And, by the time the laws changed to impose upon a royalty interest owner an obligation to pay tax upon the gas, the royalty interest owner here had already contracted with its lessee to assure that the lessee paid the first two percent of the tax. Given this pre-existing contractual arrangement, the subsequent statutory changes to which Chesapeake alluded had and have no affect upon Sneed's entitlement and Chesapeake's obligation.[3]

We further acknowledge Chesapeake's alternate contention. It involved several components. The first encompassed the proposition that any tax for which Sneed was statutorily responsible automatically became a new tax. The second encompassed the proposition that both Texoma and Sneed agreed to pay their *pro rata* share of all new taxes. And, from these components, Chesapeake deduced that since the royalty owner agreed to pay his *pro rata* share of the new tax, it was not liable to pay the first two percent of the new tax. To accept this contention, however, would be to ignore aspects of

---

[3]Nor did Chesapeake provide either argument or authority indicating that the statutory changes legally precluded us from enforcing the original terms of the division order. This dearth of argument and authority affords us little basis upon which to relieve Chesapeake of its contractual obligation.

paragraph "Fourth," and that we cannot do. Authority prohibits us from simply selecting particular words and phrases of a contract to weigh when others exist which are also of import. Again, we must read the document as a whole, *Cross Timbers Oil Co. v. Exxon Corporation,* 22 S.W.3d at 26, and afford meaning to each word written when at all possible. *See ABS Sherman Properties, Ltd. v. Sarris,* 626 S.W.2d 538, 539 (Tex. App.–Texarkana 1982, writ ref'd n.r.e.) (requiring the court to assign import to all words of the agreement). Consequently, here, the words and phrases surrounding reference to the imposition of a "new tax" cannot be ignored. Of particular import are the passages appearing before and after the allusion to a "new tax" and which contain the word "increase." The former reads "[i]f hereafter there shall be any *increase* in the amount of said tax" while the latter states "one-eighth (1/8) of *such increase* shall be deducted from the above agreed royalty value of the gas . . . ." (Emphasis added). And, when those passages are read along with that mentioning a "new tax," there can only be but one reasonable interpretation of what the parties intended. They sought not to distinguish between old and new taxes but rather define what was to be included in the idea of an "increase" in taxes. And, the "increase" intended by their words was any tax, new or old, that exceeded the two percent mentioned in the opening sentence of paragraph "Fourth."

In sum, paragraph "Fourth" addressed the obligation of paying taxes imposed upon the gas produced. Through that provision, the parties agreed among themselves that royalty owners, such as Sneed and now Denson, would 1) share in the obligation once the tax exceeded two percent and 2) then pay only their fractional share of the excess when

6

the tax exceeded that threshold.[4]  So, because the trial court interpreted the provision in a way effectuating that agreement, it did not err, and we overrule Chesapeake's first issue.

*Issue Two – Does the Wording of the Judgment Comport with the Division Order?*

In its second issue, Chesapeake asserts that aspects of the judgment should be modified to comport with the relief sought and won by Denson and the wording of paragraph "Fourth."  We sustain the issue.

The modifications desired pertained to the trial court's interpretation of the order. Furthermore, Denson sought a declaration obligating "all lessors . . . to pay the first two percent . . . of severance taxes solely from their share of production, and that [her] royalty interests are to be charged with severance taxes only where those taxes exceed two percent . . . ."  Next, in addressing the prayer, the trial court decreed that

> [p]ursuant to the express terms of Plaintiff's Exhibits 3 and 28, all severance tax assessments above 2% which are assessed against the proceeds of the subject mineral production are to be divided between *the operator*, now the Chesapeake defendants, and *the applicable royalty interest owners* in the ratio of the division of the working interest and royalty interest in question.

(Emphasis added).  It is the italicized words with which Chesapeake has concern. According to it, the division order did not consist of an agreement between an "operator" and "all applicable royalty interest owners."  Rather, the parties to it were Texoma and Sneed.  Furthermore, the only litigants remaining at the time of trial were Chesapeake and the trustee for the Denson trust (the latter subsequently becoming Denson herself via substitution).  Thus, the trial court purportedly erred in referring to "the operator" and "all applicable royalty interest owners" in its judgment.  We agree and sustain the issue.

---

[4]Again, that agreement is now part of the underlying mineral lease.

7

A trial court lacks jurisdiction to enter judgment for a non-litigant; to do so constitutes fundamental error on its part if the error is apparent from the face of the record. *Supak v. Zboril,* 56 S.W.3d 785, 793 (Tex. App.–Houston [14th Dist.] 2001, no pet.). Given this and the fact that the record indicates that no other royalty owners were litigants at the time of trial, the trial court here lacked jurisdiction to adjudicate the potential claims of royalty owners other than Denson. And, since its judgment can be construed as doing so, we will modify it.

Next, we turn to the rule of procedure requiring the judgment to comport with the pleadings. TEX. R. CIV. P. 301. With this in mind, we note that Denson did not request, in her live pleadings, that the trial court address the obligations of any "operator" to pay the first two percent of the severance taxes. Instead, she sought a declaration regarding the obligation of Chesapeake and all lessees to do so.[5] Moreover, while an operator may be a lessee, a lessee may not necessarily be an operator. So, placing the obligation to pay the tax upon the "operator" exceeds the scope of relief requested by Denson. Thus, the judgment will be modified to correct this.

Accordingly, the second sentence in paragraph arabic number three of the judgment is modified to read: "Pursuant to the express terms of Plaintiff's Exhibits 3 and 28, all severance tax assessments above 2% which are assessed against the proceeds of the subject mineral production are to be divided between Chesapeake Panhandle Limited Partnership and Chesapeake Operating, Inc., and their successors-in-interest, and Lillian

---

[5]In her pleading, Denson actually alludes to "all lessors." But, we view this as a typographical error. Given the context of the allegation, she obviously meant "all lessees."

B. Denson, and her successors in-interest in the ratio of the division of the working interest and royalty interest in question."  As modified, the judgment is affirmed.


Brian Quinn
Chief Justice