COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| CLAYTON WILLIAMS ENERGY, INC. and CHESAPEAKE EXPORATION, L.L.C., | § | |
| | § | No. 08-14-00133-CV |
| Appellants, | § | Appeal from the |
| v. | § | 143rd District Court |
| BMT O & G TX, L.P., GOLIAD O & G TX, L.P., WD O & G TX, L.P., KEYSTONE O & G TX, L.P., and THRU LINE O & G TX, L.P., | § | of Reeves County, Texas |
| | § | (TC# 12-02-20072-CVR) |
| | § | |
| Appellees. | § | |

## **O P I N I O N**

In this case, we must decide whether a group of mineral right owners can obtain damages for alleged breaches of a lease's assignment and operation clauses when the lessee, without notice, agreed to "farm out" part of the leasehold to a subcontractor in exchange for drilling services. No party disputes that the subcontractor performed the drilling activities necessary to perpetuate the lease; the only issue here is whether the lease expired or allowed for termination when the subcontractor tried to step into the lessee's shoes as drilling operator. We hold it did not. We vacate the portion of the trial judgment granting an award to a non-party, reverse the remainder of the trial court's judgment, and render a take-nothing judgment against the lessors.

### **BACKGROUND**

The lessors in this case are BMT O & G TX, L.P.; Goliad O & G TX, L.P.; WD O & G TX, L.P.; Keystone O & G TX, L.P.; and Thru Line O & G TX, L.P. (collectively Lessors). It is undisputed that on June 1, 2008, the Lessors and Appellant Chesapeake Exploration, L.L.C. (Chesapeake) signed an oil and gas lease covering tracts of land in Reeves County, Texas, including the Disputed Tract (the Bass Lease). The Bass Lease's habendum clause in Paragraph 2 sets out the term length of the lease and what Chesapeake had to do to perpetuate the lease. Specifically:

> Subject to the other provisions herein contained, this Lease shall remain in force for three (3) years from the Effective Date hereof (hereinafter referred to as the 'Primary Term') and as long thereafter as drilling operations are being conducted hereunder, as hereinafter provided, or this Lease is being maintained by other provisions hereof or oil and gas, or either one of them, are being produced in paying quantities hereunder . . . .

Under Paragraph 6, Chesapeake was "deemed to be engaged in continuous drilling operations if the interval between the deemed date of completion of one well and the commencement of actual drilling operations . . . for the next succeeding well is not more than one-hundred and eighty (180) consecutive days." While Paragraph 26 states that the lease creates covenants that run with the land and bind each party's "respective successors, legal representatives, heirs, assigns, lessees, and sublessees[,]" Paragraph 9 also creates limitations on the parties' ability to assign their rights under the lease (the Assignment Clause):

> **9. Assignment**. . . . Any assignment, sale or transfer of, or agreement to sell, assign or transfer any interest or interests of Lessee in or under this Lease may not be made by Lessee, other than to Assignee's [sic][1] subsidiaries, affiliates, internal partners, AMI partners and Petro-Hunt L.L.C., without the prior written consent of Lessor, which consent shall not be unreasonably withheld and any assignment, sale or transfer so made shall expressly be subject to all the terms and provisions

---

[1] Both parties agree that this was a typographical error, and that this provision should have actually said "Lessee's" and not "Assignee's." The same applies to "Assignor," which apparently should say "Lessor."

of this Lease, and the assignee expressly agrees to be bound by the terms hereof in writing. Lessee shall furnish Assignor [sic] a fully-executed copy of any such sale, assignment or transfer.

Paragraph 10 sets out the lease's operational requirements (the Operator Clause):

**10. Operator.** Lessee shall be designated Operator as to all operations of every nature conducted on the Leased Premises including but in no way limited to, the operation of all wells on this Lease and any approved geophysical, seismic, or other operations conducted on the Leased Premises. Lessee shall remain primarily liable and obligated to Lessor for the fulfillment of all covenants, both expressed and implied, and all legal and contractual obligations imposed upon Lessee as designated Operator hereunder. Operator must at all times adhere to all Federal, State and Local laws and regulations and maintain good partnership or corporate standing. Operator must maintain the property free and clear of liens at all times and further must act as a prudent Operator in accordance with the provisions of this Lease and standard industry practices. Adherence to the provisions of this paragraph are material to the granting of this Lease and any violation or failure to perform the requirements of this provision shall be considered a material breach. Any assignments to third parties of rights hereunder shall specifically notify and set forth the requirements of this provision.

Finally, Paragraph 19 sets out both the effect of any breach by Lessee and the lease's notice-and-cure provisions (the Default Clause):

**19. Default.** The breech [sic] or default by Lessee of any of the obligations arising hereunder shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part until Lessor has provided written notice to Lessee that Lessor considers Lessee to be in breech [sic] or default and Lessee fails to reasonably cure or remedy such default within sixty (60) days of Lessee's receipt of such notice.

### *Chesapeake Farms Out Drilling Operations to Clayton Williams Energy*

The Bass Lease's primary term began June 1, 2008 and was slated to end three years later on June 1, 2011 per the habendum clause. At that time, the lease would terminate automatically unless Chesapeake had begun drilling operations. As the Bass Lease's primary term drew to a close, Chesapeake and co-Appellant Clayton Williams Energy, Inc. (Clayton Williams Energy)

3

executed a "farmout agreement" on March 1, 2011 (the Farmout Agreement).[2] The terms of the Farmout Agreement specified that Chesapeake and Clayton Williams Energy were "AMI partners."[3] Under the Farmout Agreement, Clayton Williams Energy agreed to drill at least twenty carried wells on various Chesapeake leaseholds, including the Bass Lease, at no cost to Chesapeake by March 1, 2012. In exchange, Clayton Williams Energy would receive a 75 percent interest in 640 acres from Chesapeake's leaseholds upon completion. If Clayton Williams Energy failed to drill the required wells, it could face up to $15 million in penalties. Neither Chesapeake nor Clayton Williams Energy informed the Lessors about the Farmout Agreement.

At trial, the Lessors stipulated that "Clayton Williams, as operator, commenced the drilling of the 21 well [located on Bass Lease land] before the expiration of the primary term and maintained continuous operations as defined in the lease until the time of our notice on October 24th[.]"

### Lessors' Discovery of the Farmout Agreement, Petrohawk's Offer, and Aftermath

While Appellants were entering into an agreement to drill the Bass Lease, the Lessors were also apparently entertaining offers on the Bass Lease in anticipation of its primary term expiring without drilling operations. The Lessors were unaware of Appellants' partnership or the Farmout Agreement.

---

[2] "A farmout is a common form of agreement between operators, in which a lease owner that does not want to drill assigns the lease, or some portion of it, to another operator that does." *Young Refining Corp. v. Pennzoil Co.*, 46 S.W.3d 380, 389 (Tex.App.--Houston [1st Dist.] 2001, pet. denied). "The primary characteristic of the farmout is the obligation of the assignee to drill one or more wells on the acreage as a prerequisite to completion of the transfer." *Id.* [Citation and emphasis omitted]. In essence, an oil company will reward another operator who fulfills its lease obligations with a sublease or rights assignment, often as a way to fulfill its contractual with the landowner while sharing financial risks of drilling operations and increasing its ability to profit off of petroleum products it may not be equipped to market by including a third party in the deal. *See* John S. Lowe, *Analyzing Oil and Gas Farmout Agreements*, 41 Sw.L.J. 759, 778-81 (1987).

[3] Both parties agree that "AMI" stands for "area of mutual interest." The significance of this term is addressed in the Discussion portion of this opinion below.

On July 29, 2011, nearly two months after the Bass Lease's primary term ended, the Lessors sought to obtain a signed release of the Bass Lease from Chesapeake. Chesapeake e-mailed the Lessors back on August 15, 2011, stating that it believed the Bass Lease was being held open by the drilling activities undertaken by Clayton Williams Energy under the Farmout Agreement.

On October 24, 2011, the Lessors notified Chesapeake and Clayton Williams Energy by letter that Chesapeake's farmout breached the terms of the Bass Lease. They also asserted that Chesapeake defaulted on the lease because Chesapeake was the only authorized operator, and that since no authorized operator had begun drilling prior to the expiration of the primary term, the leasehold reverted back to the Lessors. Clayton Williams Energy, on behalf of itself and Chesapeake, responded on October 28, 2011. Appellants denied breaching the terms of Bass Lease, since the lease allowed Chesapeake to assign its rights to any AMI partners without the Lessors' notice or prior consent. They also denied that the Operator Clause prohibited Chesapeake from seeking out Clayton Williams Energy's assistance, but maintained that if it constituted a breach, they could "undo" the breach by refiling Texas Railroad Commission paperwork naming Chesapeake as the well operator.

The cure period set by the Bass Lease's Default Clause expired on December 23, 2011, sixty days after the Lessors provided written notice to Appellants on October 24. Clayton Williams Energy ceased drilling operations on October 24, following receipt of the Lessor's letter. In a letter from Clayton Williams Energy to Chesapeake dated December 21, 2011, Clayton William's counsel stated that Chesapeake and Clayton Williams Energy had agreed that Clayton Williams Energy would resign as operator, and that Chesapeake would take administrative steps to have itself named as operator with the Texas Railroad Commission by

5

filing a P-4 Form, but that "formal recognition of the RRC Lease ID number" was a prerequisite to filing the P-4, and it had "just received the RRC ID number." Clayton Williams Energy also apparently forwarded a copy of the P-4 to Chesapeake for its review and approval. Chesapeake's agent purportedly signed the form on December 21. However, a stamp on the form indicates the Railroad Commission received the P-4 Form on January 18, 2012. The Railroad Commission issued an order granting the change of operators on January 26, 2012. The effective date of the change, per the order, was December 21, 2011.

The Lessors alleged in their amended petition that on January 17, 2012, Petrohawk Properties, L.P. offered to lease 1,022 mineral acres previously leased to Chesapeake under the Bass Lease for a $3,000 per acre bonus. The Lessors further alleged that they would have accepted the offer, but Chesapeake and Clayton Williams Energy's actions prevented them from entering into the lease with Petrohawk.

### PROCEDURAL HISTORY

In February 2012, the Lessors filed suit against Appellants. In their First Amended Petition, Lessors brought claims for trespass to try title, declaratory judgment, breach of contract as to Chesapeake, and attorneys' fees. The trial court divided the case into two phases: the first purportedly dealt with liability, and the second with damages.[4]

On January 29, 2013, the trial court signed the Lessors' Proposed Findings of Fact and Conclusions of Law. In those findings, the trial court held that Clayton Williams Energy was the actual designated operator as between Chesapeake and Clayton Williams Energy, and that Clayton Williams Energy performed drilling operations without authorization under the lease. As such, Clayton Williams Energy could not perpetuate the lease on Chesapeake's behalf.

---

[4] We note, as explained further below, that Lessors supplemented their petition to include additional substantive claims in Phase II.

6

Further, because Chesapeake never conducted drilling operations itself prior to the expiration of the primary term, the mineral estate terminated and reverted back to the Lessors.

At the beginning of Phase II, Lessors supplemented their petition to include claims for common law and *Kishi*[5] trespass to the mineral estate, common law failure to release a lease, and slander of title.[6] They also supplemented their trespass to try title and contract claims to include special damages stemming from the loss of the Petrohawk Lease; loss of hydrocarbons; loss of value to the mineral estate from June 1, 2011, until the date the trial court issued its Phase I Findings of Fact and Conclusions of Law on January 29, 2013; and damages to the wellbore, subsurface, and reservoir. Following a trial to the bench, the trial court entered its Phase II Findings of Fact and Conclusions of Law on December 19, 2013. The trial court found *inter alia* that Appellants' actions caused Lessors to lose potential income from the Petrohawk deal and deprived them of income from the mineral estate from Appellants' unlawful holdover. The trial court assessed $2,863,476.00 in damages and $780,000.00 in attorneys' fees accrued through trial. On January 17, 2014, the trial court entered a final judgment that incorporated its Phase I and Phase II findings of fact and conclusions of law by reference. Chesapeake and Clayton Williams Energy timely appealed.

**DISCUSSION**

Chesapeake, by four issues, and Clayton Williams Energy, by five issues, contend that the trial court erred in assessing damages against them because they never breached the Bass Lease and because Chesapeake's leasehold never terminated prior to the Lessor's repudiation

---

[5] *Humble Oil & Ref. Co. v. Kishi*, 276 S.W. 190 (Tex.Comm'n App. 1925, judgm't affirmed), *judgm't set aside on reh'g*, 291 S.W. 538 (Tex.Comm'n App. 1927, holding approved).

[6] The Texas Supreme Court "has established that a cause of action to recover damages for the failure to release a purported, though not actual, property interest is a cause of action for slander of title." *Ellis v. Waldrop,* 656 S.W.2d 902, 905 (Tex. 1983).

7

notice. We agree.

The threshold question in our review of a contract is whether the instrument is ambiguous or not. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 230 (Tex. 2003). Ambiguity affects both the standard and scope of appellate review. We review unambiguous contacts and mineral deeds *de novo*, limiting our scope of review to the "four corners" of the document and excluding any extrinsic evidence from consideration. *Victory Energy Corp. v. Oz Gas Corp.*, -- S.W.3d --, 2014 WL 8045237, at *8 (Tex.App.--El Paso Sept. 17, 2014, pet. denied). An ambiguous contract opens the door to parol evidence that sheds light on the parties' true intent. *Id*. Consequently, we review interpretation of ambiguous contracts as a mixed question of fact and law. *Id*.

To determine if a contract is ambiguous, we look only to its text and do not consult parol. *J.M. Davidson, Inc.*, 128 S.W.3d at 230. "[I]f a written instrument remains reasonably susceptible to more than one meaning after the established rules of interpretation have been applied, then the instrument is ambiguous[.]" *Gore Oil Co. v. Roosth*, 158 S.W.3d 596, 599 (Tex.App.--Eastland 2005, no pet.). If there is only one reasonable reading of a contract, the parties' intent is a pure question of law and we are bound to interpret the terms of the contract as written and not how the parties would like them to have been written. *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d 497, 504 (Tex.App.--Waco 1997, pet. denied).

We review the trial court's fact-findings under the legal and factual sufficiency standards. We sustain a legal sufficiency challenge when the trial court's decision is unsupportable as a matter of law because (1) there is "a complete absence of evidence of a vital fact," (2) "the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove

8

a vital fact," (3) there is "no more than a mere scintilla" of evidence proving a vital fact; or (4) the evidence conclusively establishes the opposite proposition of a plaintiff's proffered vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). We view evidence in the light most favorable to the ruling on a legal sufficiency challenge, indulging "every reasonable inference" in the trial court's favor. *El Paso Indep. Sch. Dist. v. Pabon*, 214 S.W.3d 37, 41 (Tex.App.--El Paso 2006, no pet.). "Any evidence of probative force supporting a finding requires us to uphold" the trial court's ruling. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). Where an outcome-determinative interpretation of evidence falls within the zone of reasonable disagreement, we are without jurisdiction to disturb the verdict or decision for legal sufficiency. *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 758 (Tex.App.--Dallas 2008, no pet.).

In a factual sufficiency challenge, we review the entire record in a neutral light and set aside the trial court's ruling only where it rests on evidence so weak or the finding is so contrary to the great weight and preponderance of the evidence that it shocks the conscience or is manifestly unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *El Paso Healthcare Sys., Ltd. v. Carmona*, 160 S.W.3d 267, 274 (Tex.App.--El Paso 2005, pet. granted, judm't vacated w.r.m.). While the overlap between legal and factual sufficiency is substantial, a legally sufficient verdict may still be overturned as factually insufficient. *See In re Commitment of Myers*, 350 S.W.3d 122, 130 (Tex.App.--Beaumont 2011, pet. denied); *In re Estate of Russell*, 311 S.W.3d 528, 532 (Tex.App.--El Paso 2009, no pet.). Where an appellate court reverses a verdict or judgment on factual insufficiency grounds, it "must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Francis*, 46 S.W.3d at 242 [Internal quotation marks omitted].

*Analysis*

9

Although the Lessors and Appellants raise numerous arguments and issues, the ultimate disposition of this appeal rests on one question: did the lease allow Chesapeake to assign its drilling rights to Clayton Williams Energy without first asking the Lessors' permission? If so, all of the Lessors' property and contract claims necessarily fail. We find that the lease unambiguously gave Chesapeake that right.

## 1. Lease Interpretation

As a threshold matter, we must construe the Bass Lease. At issue here is the interaction of two separate provisions against the backdrop of the entire lease: the Assignment Clause and the Operator Clause.

### A. *The Assignment Clause*

We first turn our attention to the Assignment Clause. The parties fundamentally agree that the Assignment Clause gives Chesapeake the right to assign, without notice, rights to Chesapeake's "AMI partners." The parties also generally agree what an AMI partner is understood to be, with both pointing to the following industry definition of "area of mutual interest agreement" from *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 905 (Tex. 1982):

> In an area of mutual interest agreement, the parties attempt to describe a geographic area within which they agree to share certain additional leases acquired by any of them in the future. This necessarily contemplates that oil and gas leasehold interests will be conveyed.

*Id.* at 905.

Instead, the Lessors and Appellants disagree over which types of AMI partners were eligible to receive assignments under the Bass Lease. Lessors argue that the purpose of the AMI partners exception to assignment was "to free a lessee who is subject to an existing AMI obligation that covers the lands within the lease being negotiated from being forced to elect

10

between breaching the consent requirement for assigning the lease or breaching the AMI's assignment obligation." [Emphasis omitted]. In other words, the Lessors contend that the language shows the parties intended to restrict the AMI partners exception to only AMI partnerships existing at the time the Lessors and Chesapeake consummated the lease in order to let Chesapeake transfer interests to third parties and meet any obligations it might have without violating its non-assignment agreement with the Lessors. We disagree.

Nothing in the plain language of the Assignment Clause suggests there is a temporal restriction on its scope that would freeze the parties in time and limit their ability to convey without notice their interests not only just among a certain class of trusted entities, but a class of trusted entities in existence at the time of the contract. That reading stretches the meaning of the words in the Assignment Clause too far. The Lessors point to witness testimony explaining that they understood the AMI partners language to impose such a restraint. But the Assignment Clause is not ambiguous, nor do the Lessors argue that the definition of "AMI partner" is fundamentally ambiguous; thus, we cannot consult parol evidence to vary its terms or write new clauses into the parties' contract. *Victory Energy Co.*, 2014 WL 8045237, at *8. Under the plain terms of the lease, Chesapeake was free to convey whatever rights and obligations it wanted to its "AMI partners" without notifying the Lessors, regardless of whether those AMI partnerships existed at the lease's inception.

The Lessors urge us not to take this reading because it would render the Assignment Clause meaningless and would lead to absurd results. But the fact that Chesapeake could create an AMI partnership after signing the Bass Lease and then transfer its interests to the AMI partner does not render the notice provisions in the Assignment Clause meaningless. Chesapeake would still have to provide notice to the Lessors if it intended to transfer interests to a non-trusted third

11

party—and the Lessors would still have veto power over that transfer if it was unreasonable. We also do not see how failing to read an implicit provision into the Assignments Clause would lead to the absurd result of letting Chesapeake circumvent notice provisions through AMI partnerships. Chesapeake could easily accomplish the same result by forming new subsidiaries or obtaining new affiliates, and the Lessors do not argue the temporal restriction applies to the entire class of trusted entities in the Assignments Clause, only to AMI partners because that was their subjective intent. As we said before, this stretches the language of the Assignments Clause too far and asks us to write in new provisions to the lease. We will not do so.

Finally, the Lessors argue that even if Chesapeake could assign its interests to AMI partners that came into existence after the Bass Lease was signed, Clayton Williams Energy cannot be Chesapeake's AMI partner because it is a farmee. Under these facts, this is a distinction without a difference. The Farmout Agreement arose within the context of a larger AMI agreement between Appellants. As such, Clayton Williams Energy is both an AMI partner and a farmee. The Lessors can point to no provision in the Bass Lease that prevents an AMI partner from also being a farmee, and they cite no legal authority for their contention that an AMI partner cannot also be a farmee as a matter of law. As such, the Assignments Clause embraces Clayton Williams Energy as Chesapeake's AMI partner and allows Chesapeake to transfer any rights it may have to Clayton Williams Energy without prior approval from the Lessors.

### B. The Operator Clause

We next review the Operator Clause. The Lessors maintain that, notwithstanding any abilities Chesapeake may have had under the Assignment Clause, the Bass Lease specifically required Chesapeake to be the "designated Operator" of the leasehold. Under their reading, this

12

phrase meant that Chesapeake had to conduct all drilling operations personally. Because Chesapeake assigned its drilling rights to Clayton Williams Energy in the Farmout Agreement and named Clayton Williams Energy as operator for purposes of the Farmout Agreement and before the Texas Railroad Commission, Chesapeake breached the Bass Lease's Operator Clause. Further, because Clayton Williams Energy never received a valid assignment of drilling rights from Chesapeake, and because Clayton Williams Energy was a stranger to the Bass Lease, its drilling operations failed to perpetuate the Bass Lease, meaning that Chesapeake's fee simple determinable mineral estate terminated automatically and reverted back to the Lessors at the end of the primary term. We disagree.

First, the Lessor's contention that the Operator Clause restrains Chesapeake from alienating its operational rights is belied by the Operator Clause itself, which states: "Any assignments to third parties of rights hereunder shall specifically notify and set forth the requirements of this provision." This sentence indicates that operational rights can be assigned to third parties. The Lessors' proposed reading renders this sentence totally nugatory. We must avoid reading textual provisions as meaningless, if possible. Second, the Lessors' argument that Chesapeake was required to perform drilling operations itself is also unreasonable in light of other lease provisions. References to the Lessee indemnifying the Lessor against wrongful death claims arising from "Lessee's contractors and subcontractors" in Paragraph 13 (the Indemnity Clause) and the Binding Effect Clause in Paragraph 26 that states all terms "shall be binding upon and inure to the benefit of the Lessee, and Lessor, and each of their respective . . . assigns, *lessees, and sublesses*[,]" seem to indicate that the parties contemplated that Chesapeake could and would assign its rights, including operational rights. [Emphasis added]. *See Jackson v. Pure Oil Operation Co.*, 217 S.W. 959, 961 (Tex.Civ.App.--Fort Worth 1919, writ dism'd)(lease

provisions indicating that covenants and agreement bind "heirs, legal representatives and assigns" demonstrate parties intent to make lease interests conveyable).

More to the point, the designated operator language's position within the Bass Lease sheds light on the parties' intent. The Lessors appears to suggest that the phrase "designated Operator" meant not only that Chesapeake had to personally conduct drilling operations, but also be the designated operator with the Texas Railroad Commission as evidenced by a P-4 Form. However, when interpreting a legal document, we do not cherry-pick words and read them in a vacuum; we read them in their context within the document. Additionally, although the Lessors assert that "Operator" has a "well-defined meaning in Texas" under various "Texas statutes, Commission regulations, applicable case law, treatises, and industry usage[,]" we note that in the context of interpreting this lease, all those things constitute parol evidence that we may consult only where the lease language at issue is ambiguous. *See Dynegy Midstream Srvs., L.P., v. Apache Corp. Partnership*, 294 S.W.3d 164, 169-70 (Tex. 2009)(expert testimony on "standard practice in the industry" constitutes parol that could not vary definition of unambiguous contract term).

Language is only ambiguous in a legal document where it can be reasonably read in context two different ways. While the phrase "designated Operator" could mean the party who appears as operator on a P-4 Form with the Texas Railroad Commission, it is clear from reading the phrase in context that when the parties at bar used the phrase "designated Operator" in the Bass Lease, they intended to set up an indemnity-type arrangement between the Lessors and Chesapeake. The Operator Clause established that the Lessee, i.e. Chesapeake, would be the "designated Operator." The Operator Clause in the next sentence states: "Lessee shall remain primarily liable and obligated to Lessor for the fulfillment of all covenants, both expressed and

14

implied, and all legal and contractual obligations imposed upon Lessee as designated Operator hereunder." The Operator Clause further states that "Operator must at all times adhere to all Federal, State and Local laws and regulations and maintain good partnership or corporate standing. Operator must maintain the property free and clear of liens at all times and further must act as a prudent Operator in accordance with the provisions of this Lease and standard industry practices." We believe that the unambiguous reading of "designated Operator" as used in the Bass Lease was that Chesapeake agreed to oversee and remain primarily liable for any operations, and in the event something went wrong with the Bass Lease, the Lessor's recourse would be through Chesapeake.

The Lessors maintain that Chesapeake's designation of Clayton Williams Energy as "operator" in the Farmout Agreement invalidated the Bass Lease, which named Chesapeake as operator, because the two agreements irreconcilably conflict. Litigants raised the same argument in *IMCO Oil & Gas Co. v. Mitchell Energy Corp.*, 911 S.W.2d 916 (Tex.App.--Fort Worth 1995, no writ). In *IMCO*, three oil companies--Mobil, Texaco, and Getty--all owned the mineral interests in an area known as the Lassater Field. Under a 1945 Operating Agreement, the three companies agreed that if they wanted to convey an interest in the Lassater Field, they would grant the other companies the right of first refusal. The 1945 Operating Agreement also designated Mobil as "operator" of the Lassater Field. The three companies then executed farmouts with Westland. Westland was able to earn valid mineral rights interests from Mobil and Getty. Under the Mobil farmout, Westland executed a 1972 Operating Agreement with Mobil that designated Westland as "operator." Later, Westland tried to sell IMCO its interest in the Lassater Field, but Mobil's successor, which still retained rights in the Lassater Field, exercised its right of first refusal and purchased the land instead. IMCO then sued Mobil's

15

successor for tortious interference with a contract. *IMCO Oil & Gas Co.*, 911 S.W.2d at 917-18.

One of the arguments IMCO raised was that the 1972 Operating Agreement was ineffective because it conflicted with the 1945 Operating Agreement, since the 1945 Operating Agreement named Mobil as the Lassater Field's operator but the 1972 Operating Agreement named Westland as the Lassater Field's operator. *Id.* at 919-20. The Fort Worth Court of Appeals found this argument unpersuasive, stating that the two agreements could be harmonized: the 1945 Operating Agreement designated Mobil as operator as between the original landowners, and the 1972 Operating Agreement designated Westland as operator for the purposes of Mobil's subcontract. *Id.* Although this case differs procedurally from *IMCO*, our sister court's interpretation of the two operating agreements is instructive and bolsters our reading of the Bass Lease and the Farmout Agreement as non-conflicting.

Finally, the Lessors contend that even if Chesapeake could have assigned its lease rights to Clayton Williams Energy, the Farmout Agreement here did not perpetuate the lease because Clayton Williams Energy never actually received any ownership rights in the leasehold. Instead, transfer of title was contingent on fulfillment of the Agreement, which indisputably never occurred. Since Clayton Williams Energy never received title, it could not as a matter of law have done anything that have any legal effect on the lease. We again disagree.

The Lessors here conflate ownership rights with drilling rights. "The owner of a mineral estate possesses a bundle of interests which can be separated, conveyed, or reserved upon any terms as the mineral owner deems proper." *Marrs & Smith P'ship v. D.K. Boyd Oil & Gas Co., Inc.*, 223 S.W.3d 1, 14 (Tex.App.--El Paso 2005, pet. denied). "These mineral rights consist of the rights to participate in bonuses, rentals, and royalties; the exclusive right to enter the premises for the purpose of drilling; and the right to execute oil, gas and mineral leases." *Id.*

Here, the Lessors conveyed a leasehold interest to Chesapeake in the Bass Lease, which included the rights to drill. Chesapeake, in turn, could convey its own rights to other parties in whatever combination it wished, provided that those conveyances did not contravene the terms of the lease. *Cf. ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 314 (Tex.App.--Houston [1st Dist.] 2005, pet. denied)(lessee's farmout of portions of one lease to a third party violated maintanence-of-interest provision which specifically stated that a transfer was valid only where lessee conveyed equal undivided interest in *all* leases in a particular area).

The Lessors are correct that under the Farmout Agreement, Clayton Williams Energy only obtained a contingent partial ownership interest in the Bass Lease mineral estate. But that is irrelevant to the question of whether Clayton Williams Energy received valid, fully operative *drilling* rights, which can be held separately from ownership rights. *Marrs & Smith P'ship*, 223 S.W.3d at 14. Here, as we previously concluded, Clayton Williams Energy did receive drilling rights. And it is axiomatic that when an assignee receives a transfer of rights under a contract, the assignee steps into the assignor's shoes for purposes of that contract. Clayton Williams Energy properly fulfilled Chesapeake's lease obligations. *See Frontier Communications Northwest, Inc. v. D.R. Horton, Inc.*, No. 02-13-00037-CV, 2014 WL 7473764, at *1 (Tex.App.--Fort Worth Dec. 31, 2014, no pet.)(mem. op.).

In sum, Chesapeake validly assigned its drilling rights to Clayton Williams Energy, its AMI partner, under the aegis of the Bass Lease's Assignment Clause. The Operator Clause imposed no substantive limitation on Chesapeake's ability to assign operational rights, since that clause's purpose was only to allocate liability between the original parties to the Bass Lease and provide the Lessors with a way to obtain recourse from Chesapeake—the "designated Operator"—in the event something went wrong. As such, Chesapeake never breached the Bass

17

Lease's assignment restrictions. Furthermore, Clayton Williams Energy, as Chesapeake's drilling rights assignee, validly stepped into Chesapeake's shoes for the limited purpose of fulfilling Chesapeake's obligations under the Bass Lease. Because the Lessors at trial stipulated that Clayton Williams Energy's drilling activities would have perpetuated the Bass Lease had Chesapeake performed them, and because Clayton Williams Energy validly acted on Chesapeake's behalf as its assignee, Clayton Williams Energy perpetuated the lease and Chesapeake's fee simple determinable mineral estate continued to be in effect through the Lessors' repudiation of the lease.

## 2. The Lessors' Claims In Light of Our Lease Construction

Having construed the Bass Lease, applied undisputed facts, and reached the conclusion that Clayton Williams Energy fulfilled Chesapeake's lease obligations and perpetuated the mineral estate created thereunder, we review the legal sufficiency of each of the Lessor's causes of action and find them to be untenable.

First, the Lessors brought a cause for trespass to try title and mineral trespass. "[A] trespass to try title action is the exclusive method to adjudicate rival claims of title to real property." *Vernon v. Perrien*, 390 S.W.3d 47, 54 (Tex.App.--El Paso 2012, pet. denied). "The prevailing party's remedy is title to, and possession of, the real property interest at issue." *Id*. "In a trespass-to-try-title action, the plaintiff is required to prove its title by proving (1) a regular chain of title of conveyances from the sovereign to the plaintiff; (2) a superior title to that of the defendant out of a common source; (3) title by limitations; or (4) prior possession which has not been abandoned." *Id*. at 54-55. Here, Chesapeake had title to the mineral rights by virtue of the unexpired lease perpetuated by Clayton Williams Energy. The Lessors' cause for mineral trespass must also fail, since Chesapeake held a valid leasehold in the mineral estate, and

18

Clayton Williams Energy had permission to drill the leasehold as Chesapeake's limited purpose assignee.

Likewise, Chesapeake and Clayton Williams Energy cannot be held liable for slander of title. "Slander of title is defined as a false and malicious statement made in disparagement of a person's title to property which causes him special damage." *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 109 (Tex.App.--El Paso 1997, pet. denied). "The elements are: (1) the uttering and publishing of the disparaging words; (2) that they were false; (3) that they were malicious; (4) that the plaintiff sustained special damages thereby; and (5) that the plaintiff possessed an estate or interest in the property disparaged." *Id*. at 110. Here, neither Chesapeake nor Clayton Williams Energy ever conveyed any false information to anyone—Chesapeake did, in fact, hold the mineral rights to that land, and Clayton Williams Energy drilled that land pursuant to a valid assignment.

Lessors' breach of contract claims and the declaratory judgment are also unsupportable because they are based on an incorrect reading of the contract. The Lessors' arguments before the trial and this Court were that the contract did not fundamentally permit assignment of operational rights, and the trial court agreed. However, our *de novo* reading indicates that the contract did permit Chesapeake to undertake the non-noticed assignment at issue here, and since the Lessors did not raise any arguments about violation of ancillary covenants related to assignment, we find no breach occurred.

Finally, the Lessors' attorneys' fees award, which was derivative of their declaratory judgment action, must fail because the underlying declaratory judgment was incorrect and the Lessors are not actually the "prevailing parties" as provided in Paragraph 22 of the Bass Lease and TEX.CIV.PRAC.&REM.CODE ANN. 38.001 (West 2015). In short, the Lessors were not

19

entitled to damages under any theory presented because none of their claims was meritorious.

### 3. Judgment in Favor of Non-Party

Appellants also note that the trial court awarded title and injunctive relief to a non-party: CTV O & G TX, L.P. Appellants assert that the proper remedy in this case is to vacate the award as to that non-party. We agree. "A trial court lacks jurisdiction to enter judgment for a non-litigant; to do so constitutes fundamental error on its part if the error is apparent from the face of the record." *Chesapeake Operating, Inc. v. Denson*, 201 S.W.3d 369, 373 (Tex.App.-- Amarillo 2006, pet. denied). Reforming the trial court judgment with respect to the non-litigant is the appropriate remedy in situations such as this. *Id*.

### CONCLUSION

Appellant Chesapeake's four issues and Appellant Clayton Williams Energy's five issues are sustained. We vacate that portion of the trial court's judgment awarding title and injunctive relief to non-litigant CTV O & G TX, L.P. We reverse the remainder of the trial court's judgment, and render judgment that the Appellees take nothing against the Appellants.

July 8, 2015

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.