

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| WTX FUND, LLC, | § | No. 08-17-00104-CV |
| Appellant, | § | Appeal from the |
| v. | § | 112th District Court |
| RAY HOLT BROWN, JAY F. HOLT, | § | of Reagan County, Texas |
| CHERYL JONES, JUDY BROWN WADSWORTH, JANIE H. GIDDIENS | § | (TC #1913) |
| AS TRUSTEE OF THE JANIE H. GIDDIENS TRUST, DEBRA LYNN | § | |
| MORGAN AS TRUSTEE OF THE DEBRA LYNN MORGAN REVOCABLE | § | |
| TRUST, SUSAN G. WESSON AS TRUSTEE OF THE SUSAN G. WESSON | § | |
| REVOCABLE LIVING TRUST, PATTI HOLT ELKINS, BOBBY VAN HOLT AS | § | |
| TRUSTEE OF THE BOBBY VAN HOLT REVOCABLE LIVING TRUST, AND | § | |
| JOHN THOMAS HOLT, | | |
| Appellees. | | |

## **O P I N I O N**

In this appeal, we are asked to interpret a 1951 mineral deed to determine whether grantors conveyed their entire mineral interest without reservation, or instead, reserved from the conveyance at least one incident of mineral ownership—the royalty interest—either in whole or in fractional share. Appellant WTX Fund, LLC (WTX), the successor-in-interest to the grantors' heirs, appeals the trial court's rulings on cross motions for summary judgment. WTX asserts the

trial court erred in granting judgment in favor of the heirs of grantee J.F. Holt—namely, Appellees Ray Holt Brown, Jay F. Holt, Cheryl Jones, Judy Brown Wadsworth, Janie H. Giddiens as Trustee of the Janie H. Giddiens Trust, Debra Lynn Morgan as Trustee of the Debra Lynn Morgan Revocable Trust, Susan G. Wesson as Trustee of the Susan G. Wesson Revocable Living Trust, Patti Holt Elkins, Bobby Van Holt as Trustee of the Bobby Van Holt Revocable Living Trust, and John Thomas Holt (collectively, the Holt heirs). Because we construe the 1951 deed as expressly excluding grantors' royalty right in its entirety from the conveyance, we reverse the trial court's judgment and render partial judgment in favor of WTX. Additionally, we remand the cause to the trial court for reconsideration of WTX's remedy and to consider an award of attorney's fees, if any.

## BACKGROUND

On October 18, 1951, Hamilton S. Roach and his wife, Billie Roach (grantors), signed a deed titled, "MINERAL CONVEYANCE," (the deed or 1951 deed), which conveyed to J.F. Holt and his heirs and assigns, grantors' rights, title, interest and estate to certain rights to oil, gas, and other minerals in and under described land in Reagan County, Texas. The land was more particularly described in the instrument as "Survey 114, Block 2, T & P Ry Company, Certificate No. 1/226." By use of a multi-clause structure, the deed expressly lists the rights being conveyed, followed by expanded details, and then concludes with a final paragraph of further substance.

Two years prior to signing the 1951 deed, grantors had granted two separate royalty deeds to O.L. Johnson, for a total undivided share of the size of 201.56/643.12, with each deed setting a primary term of twenty years and continuing thereafter for as long as oil, gas or other minerals

2

were produced on the property.[1]  With each of the Johnson royalty deeds, grantors expressly retained all other non-royalty rights to include their executive or leasing rights.  Notably, the reservation of the executive right provided that any future leases must "provide for at least a royalty on oil of the usual one-eighth[.]"

On the same day of the signing of the 1951 deed, Hamilton and Billie Roach joined with J.F. Holt and his wife, Ella Holt, and, together, the two couples signed an Oil, Gas and Mineral Lease with S.L. Parham (lessee) pertaining to "[t]he East Half of Section 114, Block 2, T. & P. Ry. Co. Survey."  The Parham lease provided for a 1/8 royalty to be paid to lessors and oil payments up to the cumulative amount of $128,664.  Of note, the lease also stipulated that "[i]t is agreed and understood that the bonus for this lease, and all royalties, rentals and other payments provided for herein are to be paid to J.F. Holt, his heirs, successors and assigns."  In addition to the 1/8 royalty, the lease provided for a production payment based on oil and gas production up to a cumulative cap.[2]  The Parham lease provided for a primary term of ten years and continued thereafter as long as oil, gas or other minerals were produced from the land.  At present date, the parties agree that the Parham lease has since terminated and is no longer in effect.  Instead, the

---

[1] One royalty deed conveys an undivided 161.56/643.12 interest and the other provides for a 40/643.12 interest for a total conveyance of 201.56/643.12.  Both deeds provide for a term of twenty years from the date of signing and as long thereafter as oil, gas or other minerals, or either of them, is produced or mined from the land described therein. To illustrate a portion of the deed's language, the larger of the two provides that grantors Hamilton S. Roach and wife, Billie Roach "have granted, sold, conveyed, assigned and delivered, and by these presents do grant, sell, convey, assign and deliver, unto the said Grantee an undivided 161.56/643.12 interest in and to all of the oil royalty, gas royalty, and royalty in casinghead gas, gasoline, and royalty in other minerals in and under, and that may be produced and mined from the following described lands situated in the County of Reagan and State of Texas, to-wit: All of Section 114, in Block 2, T. & P. Ry. Co. Survey Reagan County, Texas, containing 643.12 acres, more or less, together with the right of ingress and egress at all times[.]"

[2] Specifically, the lease stated: "In addition to the royalties provided for above, lessee agrees to deliver to lessor 1/16 of 7/8ths of all oil, gas and casinghead gas which may be produced and saved by lessee from oil and gas wells located on the leased premises, until the cumulative total value of such part of production shall equal [$128,664.00], at which time the obligations of this paragraph shall terminate."

3

property is currently held by new leases which provide for different terms and royalty rates. One such lease is held by Laredo Petroleum[3] while the other is held by Pioneer Natural Resources, USA (Pioneer). The Pioneer lease provides for a 1/6 royalty, while the Laredo lease provides for a 1/4 royalty.

*Trial Court Proceedings*

In 2015, Pioneer filed an interpleader action in the 112th District Court of Reagan County, Texas, pursuant to Rule 43 of the Texas Rules of Civil Procedure. Pioneer owned and operated various oil and gas properties in Reagan County on which it explored for oil and gas deposits. As a well operator, Pioneer described that it ordinarily paid proceeds to royalty owners. Pioneer was then paying royalties to ten distinct payees pertaining to land situated at SE/4 of Sec 114, Block 2, T&P Ry Co Survey, Reagan County, Texas. Pioneer described that it had since received notice from WTX informing Pioneer that it was disputing its payment of royalties for proceeds derived from the described property. To avoid multiple liability on the same debt, Pioneer filed the interpleader action against all payees who were then asserting competing royalty interests. Pioneer named WTX and the Holt heirs among the parties whom it listed as contesting royalty payments owed by Pioneer. Pioneer also made an unqualified tender of disputed funds with its interpleader action.

Responding, WTX filed not only a general denial of the action but also a crossclaim and counterclaim against all other parties. Against Pioneer, WTX asserted violations of the Texas

---

[3] In briefing, the parties agree that Laredo Petroleum holds the lease by assignment. The record shows the lease was originally contracted with Broad Oak Energy, Inc.

4

Natural Resources Code based on nonpayment of oil and gas proceeds and other interests.[4] Against all parties, WTX asserted an action for a declaratory judgment seeking relief from the uncertainty and insecurity regarding the parties' respective rights, status, and other legal relationships. WTX requested a declaration that the 1951 deed neither conveyed the mineral estate in whole nor the royalty interest owned by the grantors. WTX asserted that only leasing rights, bonuses, and delay rentals were conveyed from grantors Hamilton and Billie Roach to grantee J.F. Holt. WTX described that it became a successor-in-interest in 2015 to the grantors' reserved interest by way of a conveyance and assignment of a mineral-and-royalty interest from Y-Royalty Partners, LLC (Y-Royalty).[5]

Among its claims, WTX asserted it informed Pioneer by letter that it owned a royalty interest that it had acquired from Y-Royalty, who had obtained its interest through a series of conveyances from the heirs of Hamilton and Billie Roach, grantors of the 1951 deed. WTX further described that its interest was based on the royalty rate that was provided for in the existing oil and gas lease(s), as opposed to the fixed 1/8 interest stated in the 1951 deed. WTX further described that the lease providing a 1/8 royalty that was in effect at the time of the 1951 deed had since terminated, and a new lease with a 1/6 royalty was currently in effect. WTX claimed that Pioneer had incorrectly credited the Holt heirs with owning title to the royalty interest of the subject property. WTX sought a declaratory judgment to determine the respective rights as between

---

[4] *See* TEX. NAT. RES. CODE ANN. § 91.404.

[5] In briefing to this Court, WTX asserted that Y-Royalty Partners obtained its interests from three granddaughters of Hamilton Roach, who had inherited those interests from their father, Gerald Hamilton Roach. Y-Royalty later assigned its interest to WTX. As a result of these transactions, WTX claims ownership of 1/4 of the remaining interests that Hamilton Roach and Billie Roach purportedly did not convey in the 1951 deed.

5

WTX and the Holt heirs, and to recover monetary relief and other damages.

Eventually, after arrangements were made for Pioneer to make regular deposits into the registry of the court, the parties dismissed Pioneer by agreement. With Pioneer dismissed, the controversy over royalty payments proceeded as between WTX, as successor-in-interest of grantors, and the Holt heirs, as successors-in-interest of grantee. Thereafter, WTX filed a motion for partial summary judgment. WTX characterized the claim as a dispute as to (1) whether the 1951 deed conveyed only leasing rights, bonuses and delay rentals, and accordingly, the grantors retained the full royalty interest; or (2) whether the deed conveyed the full mineral estate, including the royalty interest, such that grantors reserved no interest of the mineral estate. WTX asserted in its motion that its present interest was based on the royalty rate in the existing oil and gas lease(s), rather than a fixed 1/8. In support of its motion, WTX relied on the 1951 deed and other documents to show it had acquired its interest from a series of transactions tracing back to the grantors of the 1951 deed.[6]

Like WTX, the Holt heirs also filed a motion for partial summary judgment. By their motion, the heirs asserted that WTX was attempting to divest them of the royalty interest conveyed in whole to their predecessors-in-interest by the 1951 deed. The Holt heirs asserted the deed conveyed all mineral rights in and under the land to J.F. Holt, and his heirs and assigns.

*The Trial Court's Decision*

The trial court agreed with the Holt heirs that the 1951 deed conveyed all of grantors'

---

[6] With its summary judgment motion, WTX included evidence to prove that it had acquired a portion of the interest that remained with Hamilton Roach and Billie Roach after the execution of the 1951 deed. At trial, the Holt heirs did not object to WTX's evidence or otherwise dispute the assertion that WTX had acquired a portion of whatever interest grantors' heirs owned after executing the deed.

6

mineral interests—including the royalty interest—to grantee J.F. Holt. Accordingly, the trial court entered final judgment incorporating its earlier order granting a partial summary judgment in favor of the Holt heirs and contemporaneously denying WTX's cross motion for summary judgment. The trial court also ordered that WTX pay the Holt heirs damages for the recovery of improperly received royalties in the amount of $93,309.22, attorney's fees and costs in the amount of $80,000, and, further, the court made provision for additional attorney's fees in the event of later appeals. The trial court also entered further orders pertaining to the release of interpleaded funds and related fees charged for the interpleader suit. Lastly, the trial court ordered pre-and post-judgment interest in accordance with the law. Following entry of the judgment, WTX timely filed this appeal.

## DISCUSSION

In a single issue, WTX broadly asserts that the trial court erred in denying its motion for partial summary judgment and in granting the cross motion of the Holt heirs. WTX asserts the trial court erred by declaring that the 1951 deed conveyed all of grantors' mineral interest including the royalty interest. WTX argues the deed reserved grantors' non-participating royalty interest while conveying all other attributes of their mineral estate. Correlated with its primary argument, WTX further argues that the trial court erred in awarding attorney's fees to the Holt heirs. Countering, the Holt heirs assert the trial court properly granted judgment in their favor by construing the deed as conveying grantors' entire undivided mineral interest (including royalty).

We address the arguments in turn.

### Standard of Review

We review a summary judgment *de novo*. *Provident Life & Acc. Ins. Co. v. Knott*, 128

S.W.3d 211, 215 (Tex. 2003). Traditional summary judgment is appropriate where there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c). When both parties move for summary judgment on the same issue and the trial court grants one motion and denies the other, the reviewing court should review the evidence presented by both sides, determine all questions presented, and render the judgment the trial court should have rendered. *Texas Workers' Compensation Com'n v. Patient Advocates of Texas*, 136 S.W.3d 643, 648 (Tex. 2004).

*Principles of Deed Construction*

To determine whether the trial court erred in its interpretation of the 1951 deed, the first issue we address is whether the deed is ambiguous. Although neither party asserts the deed is ambiguous, both parties clearly diverge on its proper interpretation. Ambiguity is a question of law for the court. *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018). Texas courts recognize that ambiguity does not arise merely because parties assert differing interpretations. *N. Shore Energy, LLC v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016). If a deed is worded in such a way that it can be given a certain or definite meaning, then the deed is not ambiguous. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 601 (Tex. 2018). Only when a deed remains susceptible to two or more reasonable interpretations, after application of rules of interpretation, does an ambiguity of interpretation arise. *ConocoPhillips*, 547 S.W.3d at 874.

The construction of an unambiguous deed is reviewed as a question of law. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991); *Clayton Williams Energy, Inc. v. BMT O & G TX, LP*, 473 S.W.3d 341, 348 (Tex. App.—El Paso 2015, pet. denied). When conducting our review, we

apply our own judgment and accord no deference to the trial court's decision. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998). Our primary duty is to ascertain the intent of the parties from the four corners of the instrument. *Wenske v. Ealy*, 521 S.W.3d 791, 794 (Tex. 2017) (citing *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991)). We must examine the entire instrument seeking to harmonize and give effect to all its provisions such that no provision is rendered meaningless. *Luckel*, 819 S.W.2d at 462; *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986). In so doing, we reject rules of construction which give priority to certain clauses over others or require the use of so-called "magic words." *Wenske*, 521 S.W.3d at 794. As a fundamental principle, "[t]he parties' intent, when ascertained, prevails over arbitrary rules." *Id*. (citing *Luckel*, 819 S.W.2d at 462).

More recently, in a case of a will dispute that necessarily involved the construction of a mineral deed, the Texas Supreme Court reaffirmed that courts must employ a holistic approach aimed at ascertaining intent from all words and all parts of the conveying instrument. *Hysaw v. Dawkins*, 483 S.W.3d 1, 13 (Tex. 2016). Importantly, *Hysaw* eschewed reliance on mechanical or bright-line rules as a substitute for "an intent-focused inquiry rooted in the instrument's words." *Id*. When discerning intent, courts construe words and phrases together and in context, not in isolation. *Id*. "[A]pparent inconsistencies or contradictions must be harmonized, to the extent possible, by construing the document as a whole." *Id*. Words and phrases bear their ordinary meaning unless the context supports a technical meaning or a different understanding. *Id*. (citing *In re Office of the Att'y Gen. of Tex.*, 456 S.W.3d 153, 155-56 (Tex. 2015) ("Given the enormous power of context to transform the meaning of language, … the import of language, plain or not, must be drawn from the surrounding context, particularly when construing everyday words and

9

phrases that are inordinately context-sensitive.")).  When applicable, *Hysaw* further confirmed

that "the estate-misconception theory and the historical use of 1/8 as the standard royalty may

inform the meaning of fractions stated in multiples of 1/8, but these considerations are not alone

dispositive."  *Id*.

*Mineral Interest Ownership, Conveyance & Reservation*

An instrument conveying land in fee simple transfers both the surface estate and all

minerals and mineral rights, unless the instrument contains a reservation or expresses a contrary

intention.  *Schlittler v. Smith*, 101 S.W.2d 543, 544 (Tex. [Comm'n Op.] 1937).  The mineral

estate is comprised of five severable rights or attributes: (1) the right to develop; (2) the right to

lease—which is also known as the executive interest; (3) the right to receive bonus payments; (4)

the right to receive royalty payments; and (5) the right to receive delay rentals.  *Hysaw,* 483

S.W.3d at 9; *KCM Financial v. Bradshaw*, 457 S.W.3d 70, 83 (Tex. 2015); *French v. Chevron*

*U.S.A., Inc*., 896 S.W.2d 795, 797 (Tex. 1995).  Each attribute is an independent property right,

may be severed into a separate interest, and may be separately conveyed or reserved by the owner.

*Concord Oil Co. v. Pennzoil Expl. & Prod. Co*., 966 S.W.2d 451, 457 (Tex. 1998) ("The owner of

a mineral interest may convey one or more, or fractions of one or more, of any attribute of the

mineral estate, including but certainly not limited to a fraction of the mineral interest, a fraction of

royalties, the right to receive delay rentals, and the executive rights.").  The words "royalty,"

"bonus," "rentals," "minerals," and "mineral rights," among others, all have well-understood

meaning in the oil and gas business.  *Schlittler*, 101 S.W.2d at 544.

*The 1951 Deed*

As a threshold matter, we agree that the deed is not ambiguous.  Nonetheless, despite an

10

absence of ambiguity, questions of interpretation arise in part due to the deed's structure—where mineral interests are listed individually—and in part due to the deed's use of the phrase "shall not affect" and the term "benefits."   Given the deed's structure, we consider each clause in turn; but ultimately, as required by controlling authority, we approach the deed holistically taking care to harmonize and give effect to all provisions so that none will be rendered meaningless.   *See Hysaw*, 483 S.W.3d at 8; *Luckel*, 819 S.W.2d at 462.

With the deed's opening lines, Hamilton S. Roach and Billie Roach (grantors) acknowledge receipt of consideration paid by J.F. Holt (grantee).   Immediately thereafter, the granting clause provides as follows:

> Have **bargained, sold, released, transferred, assigned and quitclaimed** and do by these presents **bargain, sell, release, transfer, assign and quitclaim** unto [grantee] … his heirs and assigns, … **all of grantors' right, title, interest and estate in and to the leasing rights, bonuses and delay rentals in and to all the oil, gas and other minerals in and under the following described land in Reagan County**, Texas, to wit: Survey 114, Block 2, T & P Ry Company, Certificate[.]   (Emphasis added).

First, the grantors conveyed "all of grantors' right, title, interest and estate in and to the leasing rights[.]"   Second and third, grantors also conveyed their ownership interest in "bonuses and delay rentals in and to all the oil, gas and other minerals in and under" the described property which may be due under any leases.

By naming all three interests individually—the leasing rights, bonuses and delay rentals— the grantors conveyed each of these attributes.   *Concord Oil,* 966 S.W.2d at 457 ("The owner of a mineral interest may convey one or more, or fractions of one or more, of any attribute of the mineral estate, including but certainly not limited to a fraction of the mineral interest, a fraction of royalties, the right to receive delay rentals, and the executive rights.").   The holder of the leasing

11

privilege is the executive-interest holder. *KCM Financial*, 457 S.W.3d at 75. The executive holder enjoys the right to make decisions affecting the exploration and development of the mineral estate—which is most commonly exercised by executing oil and gas leases. *See Lesley v. Veterans Land Bd. of State*, 352 S.W.3d 479, 487 (Tex. 2011). A "bonus" is the sum or amount paid for the execution of an oil and gas lease whether in cash or out of production. *Lane v. Elkins*, 441 S.W.2d 871, 874 (Tex. App.—Eastland 1969, writ ref'd n.r.e.). Delay rentals are payments made by the lessee as permitted by lease terms to perpetuate a lease when the lessee is not actively drilling or developing the leasehold. *See Ridge Natural Resources, LLC v. Double Eagle Royalty, L.P.*, 564 S.W.3d 105, 113 (Tex. App.—El Paso 2018, no pet.); *Corley v. Olympic Petroleum Corp.*, 403 S.W.2d 537, 538 (Tex. App.—Texarkana 1966, writ ref'd). Because the parties' intent must be determined by construing all provisions, however, our inquiry does not end with the granting clause alone. *See French*, 896 S.W.2d at 797 (citing *Luckel*, 819 S.W.2d at 461) ("The 'four corners' canon of construction means that the court must look at the entire instrument to ascertain the intent of the parties."); *Concord Oil Co.*, 966 S.W.2d at 457 ("The *substance* of what has been conveyed must be determined taking into account all provisions of the conveyance."). By use of the language, "quitclaimed" and "all of grantors' right, title, interest and estate in and to the leasing rights, bonuses and delay rentals … in and under the following described land," we further note that the grantors used language that quitclaimed their rights in the described mineral estate. *See Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 161 S.W.3d 482, 486 (Tex. 2005) ("A warranty deed to land conveys property; a quitclaim deed conveys the grantor's rights in that property, if any.").

Next, the deed's intended clause provides further explanation of the grantors' intent. We

address this clause in three parts given its length.   The beginning portion provides:

> It is intended by this conveyance to give to the grantee, his heirs and assigns, **the right to control and execute all oil and gas leases now on said property or which may be made thereon in the future without the necessity of grantors, heirs or assigns, joining in the execution of the same**[.]   (Emphasis added).

We note the phrase, "the right to control and execute all oil and gas leases now on said property or which may be made thereon in the future," confirms the conveyance of leasing rights with further details provided.  *See KCM Financial*, 457 S.W.3d at 75.   By this language, the grantors more fully detailed their intention to convey the right to control and execute all leases then in place and any arising thereafter.   *See Lesley*, 352 S.W.3d at 487 ("The executive right is the right to make decisions affecting the exploration and development of the mineral estate[.]").  No dispute arises from the parties about this portion of the deed's language.

Turning to the middle portion of the intended clause, the following is provided:

> [G]rantee … [is] hereby given **the right to collect any and all bonuses and benefits on any future oil and gas leases and any and all delay rentals on all oil and gas leases now upon said property or which may hereafter be made by grantee**, his heirs or assigns, thereon[.]   (Emphasis added).

We note here the deed's language moves beyond the executive right to further describe the right to collect any and all bonus and delay rentals with reference to certain time periods.   Notably, the clause also includes the term "benefits" after describing bonuses on future oil and gas leases.  Because "benefits" also appears in the remaining portion of the clause, we first set forth that portion before giving further consideration of this disputed term.

The intended clause concludes as follows:

> [I]t being intended hereby to convey to grantee, his heirs and assigns, all of grantors' right, title, interest and estate in and to **the 7/8 leasing rights or working interest in the oil, gas and minerals** in and under said land together with all **bonuses, delay rentals, oil payments and all other rights and benefits** which

13

may be provided for in any oil and gas leases which grantee, heirs and assigns, have or may hereafter execute upon the above mentioned property, **together with the right of ingress and egress at all times for the purpose of enforcing his rights thereunder**[.]   (Emphasis added).

With both the middle and last portion of the clause, the deed's language adds two important details about the nature of the conveyance.

First, leasing rights are described as "7/8 leasing rights or working interest in the oil, gas and minerals in and under said land[.]"   A "working interest" is "an operating interest under an oil and gas lease that bears all the costs of production and is held subject to the payment of royalties."   *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 714 n.9 (Tex. 2016). Notably, neither party here asserts a fractional conveyance of the leasing rights.   Thus, as *Hysaw* noted, "the historical use of 1/8 as the standard royalty may inform the meaning of fractions stated in multiples of 1/8[.]" *Hysaw*, 483 S.W.3d at 13.   Recognizing that the working interest is held subject to the payment of royalties, the fractional descriptor appearing before "leasing rights" reflects the true nature of the working interest.

A one-eighth royalty was commonplace in the general era in which the deed was executed. *See KCM Financial*, 457 S.W.3d at 75–76; *Schlittler,* 101 S.W.2d at 544–45 (suggesting that one-eighth royalty was typical at that time).   Construing deeds of similar vintage (i.e., 1960s), *KCM Financial* noted, "[t]he usual royalty is 1/8, and this fact is so generally known that judicial knowledge may be taken of it." 457 S.W.3d at 75-76 (citing Lee Jones, Jr., *Non–Participating Royalty,* 26 Tex. L. Rev. 569, 575-76 (1948)).   Indeed, so standard was a one-eighth royalty that it was assumed to be the default minimum: "If the grant or reservation is silent as to the minimum royalty to be reserved in subsequent leases, utmost fair dealing would seem to require the reservation of a royalty of at least the usual 1/8." *Id*. at 76.   Given the standard 1/8 royalty, we

14

see no conflict with the granting clause's conveyance of the leasing rights in their entirety followed by the description of "7/8 leasing rights," where the deed further describes the conveyance of the working interest.

Second, the right of development is explicitly mentioned for the first time by use of the terms "ingress and egress." *See French v. Chevron USA, Inc.*, 871 S.W.2d 276, 278 (Tex. App.—El Paso 1994), *aff'd*, 896 S.W.2d 795 (Tex. 1995). Adding to the substance, the intended clause further clarifies that grantors conveyed their right of development to the grantee.

At this point, we reach the shall-not-affect-clause, which provides as follows:

> It is understood and agreed, however, that this conveyance shall not affect any interest which any grantors, heirs or assigns, have or may have **in the future to the non-participating 1/8th royalty in and under said land,** but it shall never be necessary for grantors, heirs or assigns, to join in the execution of any instrument pertaining to any past or future oil and gas leases and the grantors, heirs or assigns, shall have no right to **any bonuses, delay rentals, oil payments or other benefits under any oil, gas and mineral leases which have been made or which may hereafter** be made by grantee, his heirs or assigns, upon said property. (Emphasis added).

Having reached the last of the deed's clauses, we arrive at the parties' sharpest points of contention—namely, the meaning of the phrase "shall not affect" and the use of the term "benefits."

*Shall Not Affect Clause*

The Holt heirs dismiss the "shall not affect" clause asserting it is unclear and ineffective to operate as a reservation of a non-participatory royalty in favor of grantors. First, the heirs contend the phrase "shall not affect" is not reflective of typical words of reservation comparable to "save and except" or "there is reserved and excepted." We disagree. By its ordinary meaning, "affect," is defined as "to act on." *Affect*, WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY (2003).

15

By including "*shall* not affect," grantors particularly described by mandatory language that the conveyance did not act on their particularly described ownership rights. Additionally, it is well settled that a grantor may reserve minerals or mineral rights to include a reservation of "royalties, bonuses, and rentals, either one, more or all." *See Schlittler*, 101 S.W.2d at 544. In full, the phrase provides that "this conveyance shall not affect any interest which any grantors, heirs or assigns, have or may have in the future to the non-participating 1/8th royalty in and under said land[.]" Given that *Hysaw* and *Luckel* confirm that magic words are not required, we are not persuaded by the heirs' argument that no words of reservation were included. *See Hysaw*, 483 S.W.3d at 13; *Luckel*, 819 S.W.2d at 463-64.

Second, the heirs contend the language may be construed not as a reservation but as a "subject to" clause protecting grantors from warranties owed to O.L. Johnson—holder of the partial royalty interest conveyed by the 1949 term deeds. Again, however, we are not persuaded. The term "subject to," when used in a mineral deed, has a well-recognized meaning. *Cockrell v. Texas Gulf Sulphur Co.*, 299 S.W.2d 672, 676 (Tex. 1956) ("The words 'subject to,' used in their ordinary sense, mean 'subordinate to,' 'subservient to' or 'limited by'"). A subject to clause operates as "a limiting clause, and a qualifying term[.]" *Id*. at 676-77. Here, rather than refer to the rights of another party, the deed's language specifies that the conveyance to grantee shall not affect grantors' own rights to the "non-participating 1/8th royalty in and under said land[.]" Clearly, there is no reference made to O.L. Johnson or to his partial interest arising from the term deeds. Moreover, because the 1951 deed is a quitclaim deed that provides no warranty, there is no warranty to breach by this conveyance to grantee. *See Geodyne Energy*, 161 S.W.3d at 487 ("a quitclaim deed without warranty of title cannot be a warranty (or 'misrepresentation') of title").

16

Accordingly, we find that the Holt heirs fundamentally mischaracterize the nature and meaning of the shall not affect clause.

In plain terms, the phrase, "this conveyance shall not affect," evidences a reservation or exception of "any interest which any grantors, heirs or assigns, have or may have" of "the non-participating 1/8th royalty in and under said land[.]" *See Perryman v. Spartan Tex. Six Capital Partners, Ltd.*, 546 S.W.3d 110, 119 (Tex. 2018) ("Although an 'exception' can refer to any 'mere exclusion from the grant,' a 'reservation' must 'always be in favor of and for the benefit of the grantor.'"); *Sharp v. Fowler*, 252 S.W.2d 153, 154 (Tex. 1952) ("A reservation of minerals to be effective must be by clear language."). In other words, the interest unaffected by the conveyance is grantors' own "non-participating 1/8th royalty in and under said land[.]" As long recognized in *Schlittler*, the term "royalty," has a well-understood meaning in the oil and gas business. 101 S.W.2d at 544. By its nature, "[a] royalty interest derives from the grantor's mineral interest and is a nonpossessory interest in minerals that may be separately alienated." *Hysaw*, 483 S.W.3d at 9. More distinct, a non-participating royalty also has a well-understood meaning. *See KCM Financial*, 457 S.W.3d at 75. Said differently, a non-participating royalty interest is "an interest in the gross production of oil, gas, and other minerals carved out of the mineral fee estate as a free royalty, which does not carry with it the right to participate in the execution of, the bonus payable for, or the delay rentals to accrue under oil, gas, and mineral leases executed by the owner of the mineral fee estate." *Id*. (citing Lee Jones, Jr., *Non–Participating Royalty,* 26 TEX. L. REV. 569, 569 (1948) (footnote omitted)). "A party possessing a royalty interest that does not include the right to lease the mineral estate, receive delay rentals, or bonus payments is referred to as a non-participating royalty-interest holder." *Hysaw*, 483 S.W.3d at 9.

17

"In and other said land," refers to the grantors' interest in Survey 114, or the property mentioned earlier in the deed's legal description. "Said" is commonly defined as "named or mentioned before." *Said*, WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY (2003). The phrase, "have or may have in the future," reflects that the reserved interest is tied to any current leases but also extends to future leases that could later come into effect. Because a reservation must always be in favor of and for the benefit of a grantor, the phrase "have or may have in the future" is consistent with a reservation of royalty for grantors and not for a third party. *See Wenske,* 521 S.W.3d at 806 ("A reservation must always be in favor of and for the benefit of the grantor."); *Pich v. Lankford*, 302 S.W.2d 645, 650 (Tex. 1957). Thus, the phrase "non-participating 1/8th royalty in and under said land," provides a clear and distinct description of the nature of the interest reserved or excepted.

The second half of the "shall not affect" clause provides further clarification that "it shall never be necessary for grantors, heirs or assigns, to join in the execution of any instrument pertaining to any past or future oil and gas leases and the grantors, heirs or assigns, shall have no right to any bonuses, delay rentals, oil payments or other benefits under any oil, gas and mineral leases which have been made or which may hereafter be made by grantee, his heirs or assigns, upon said property." By this language, the clause reaffirms that the interest reserved by grantors is non-executive which is consistent not only with the definition of a non-participating royalty interest but also with the earlier phrases describing grantors' conveyance of their leasing interest. *See KCM Financial*, 457 S.W.3d at 75; *In re Bass*, 113 S.W.3d 735, 745 (Tex. 2003) (All non-participating royalty interests are non-executive interests).

This language of reservation or exception correlates with the language that appeared in the

18

intended clause which conveyed: "all of grantors' right, title, interest and estate in and to the 7/8 leasing rights or working interest in the oil, gas and minerals in and under said land together with all bonuses, delay rentals, oil payments and all other rights and benefits which may be provided for in any oil and gas leases which grantee, heirs and assigns, have or may hereafter execute upon the above mentioned property, together with the right of ingress and egress at all times for the purpose of enforcing his rights thereunder."  For, as we noted earlier, the holder of the leasing privilege is the executive-interest holder.  *KCM Financial*, 457 S.W.3d at 75.  The executive enjoys the exclusive right to make and amend mineral leases and, correspondingly, to negotiate for the payment of bonuses, delay rentals, and royalties, subject to a duty of utmost good faith and fair dealing to non-executive interest holders.  *Id*. at 74-75.  Typical oil and gas leases convey the mineral estate as a determinable fee, but often such leases are made exclusive of interests expressly reserved to include the royalty.  *Luckel*, 819 S.W.2d at 464.  For all reasons stated, we conclude that the "shall not affect" clause is a clear and specific reservation or exception of a non-participatory royalty interest separate and apart from the conveyance of other interests.  *See Perryman*, 546 S.W.3d at 119 (an exception refers to a "mere exclusion from the grant," while a reservation must always be in favor of and for the benefit of the grantor).

*Harmonizing the Deed's Use of "Benefits"*

The Holt heirs argue that the inclusion of the word "benefits" in both the intended clause and the shall-not-affect clause should be construed as evidencing a conveyance of the grantors' royalty interest such that all attributes of the mineral estate were conveyed and none were reserved. Countering, WTX asserts that the deed's use of the term "benefits" does not support the heirs' argument.  Examining the entire instrument to give effect to all provisions, we agree that the

deed's use of the term "benefits" does not equate with a conveyance of grantors' royalty interest. *Luckel*, 819 S.W.2d at 462 (no provision shall be rendered meaningless).

Unlike terms such as "royalty" and "bonus," which have well-understood meanings, the term "benefits," operates as a catch-all for describing a variety of economic gains secured by leasing. *E.g.*, *KCM Financial*, 457 S.W.3d at 83–84 ("obtaining the same *royalty* in a mineral lease does not automatically equate to acquiring the same *benefit* from the mineral lease"); *Day & Co. v. Texland Petroleum, Inc.,* 786 S.W.2d 667, 669 n.1 (Tex. 1990) ("Other rights and attributes of the mineral estate include the right to receive delay rentals … the right to receive royalty, the right to share in *other benefits secured from the lessee* such as shut-in royalties, minimum royalties, production payments and the like[.]") (emphasis added); *Altman v. Blake*, 712 S.W.2d 117, 119 (Tex. 1986) ("[W]hy would it not encompass *all lease benefits*, including the rights to receive royalties and delay rentals?") (emphasis added).

Relying on *Altman v. Blake*, the heirs contend that because royalties are a benefit under an oil and gas lease, the mention of "benefits" should be viewed as a conveyance of the royalty interests. *Altman*, 712 S.W.2d at 119. After a close reading of *Altman,* we conclude it cannot fairly be read as holding that a royalty right is conveyed or reserved by language that alone mentions "lease benefits." In *Altman*, the parties disputed whether a deed conveyed a 1/16th interest in a severed mineral estate, or a 1/16th royalty interest, given language restricting the grantee's right to execute leases and receive delay rentals. *Id*. at 118. Specifically, the deed conveyed "an undivided one-sixteenth (1/16) interest in and to all of the oil, gas and other minerals in and under and that may be produced from the … described land[,]" but in a further provision, the deed also provided that grantee did "not participate in any rentals or leases." *Id*. at 117. From

that language, the parties heavily disputed the meaning of the term "participate." *Id*. Grantors contended the phrase, "but does not participate in any … leases," prohibited the grantee from executing any oil and gas leases and from receiving any bonus. *Id*. at 119.

Construing the language, *Altman* rhetorically asked, "If 'participation' includes the right to receive bonus payments, why would it not encompass all lease benefits, including the rights to receive royalties and delay rentals?" *Id*. at 119. Noting that the parties had "thought it necessary to expressly reserve to the grantor the right to retain delay rentals," *Altman* concluded, "[t]his suggests they did not define 'participation' so broadly." *Id*. Importantly, after considering all provisions, *Altman* noted the deed contained no direct language reserving a royalty interest. *Id*. Even though the deed reserved certain rights to grantors (i.e., to control leasing and to receive delay rentals), nonetheless, *Altman* found the deed's reservation did not change the character of the conveyance. *Id*. On review, we conclude that *Altman's* offhand reference to "benefits" fails to support the heirs' argument that the term "benefits" includes royalties regardless of context.

Instead, in construing "benefits," we are particularly guided by *KCM Financial,* a case which involved a claim of a breach of fiduciary duty brought by a non-participating royalty owner (non-executive) against an executive interest holder—i.e., the party who had negotiated the terms of a mineral lease affecting the non-executive's interest. 457 S.W.3d at 78. The non-executive interest owner (who owned a one-half non-participating royalty interest in over seventeen hundred acres of land) alleged that the executive interest holder (who shared equally in the royalty interest) had engaged in self-dealing by obtaining an exorbitant bonus payment at the expense of securing a higher royalty. *Id*. at 75 n.2, 78. Having no interest in the bonus payment, the non-executive contended the trade-off negotiated by the executive diminished the value of her non-participating

21

royalty interest. *Id*. at 78. The Supreme Court noted the case required an examination of "the contours of the duty the executive-right holder (executive) owe[d] to a non-participating royalty interest holder (non-executive)." *Id*. at 74.

Throughout *KCM Financial*, "benefits" appears as an interchangeable term operating as a catch-all to describe the economic gains of a mineral lease. Such gains include bonuses, delay rentals, royalties, or other forms of payment. Thus, *KCM Financial* acknowledges that the executive interest holder "has the power to make and amend leases affecting the enjoyment of a non-participating royalty interest owned by another[.]" *Id*. at 80 (citing *Andretta v. West*, 415 S.W.2d 638, 641 (Tex. 1967)). "When an executive negotiates a mineral lease, myriad components of any given arrangement can affect the overall value of a mineral lease, including the rights to receive royalties, delay rentals and bonuses, and other provisions like the number and placement of wells." *Id*. at 82. A non-executive interest holder may benefit from some but not all negotiated terms. *Id*. Thus, the executive holder's power, is tempered by a "duty of utmost good faith" owed to a non-participating royalty interest owner. *Id*.

Pertinent to our analysis, *KCM Financial* recognized that the deed language which conveyed the bonus but reserved an equal share of the non-participatory royalty presented a conundrum requiring the balancing of the bundle of rights comprising a mineral estate. *Id*. at 83 (quoting *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986) ("There are five essential attributes of a severed mineral estate: (1) the right to develop (the right of ingress and egress), (2) the right to lease (the executive right), (3) the right to receive bonus payments, (4) the right to receive delay rentals, [and] (5) the right to receive royalty payments.")). Of note, the Court used the term "benefits" as a catch-all term but not as an equivalent when comparing lease benefits:

22

[O]btaining the same *royalty* in a mineral lease does not automatically equate to acquiring the same *benefit* from the mineral lease. On the other hand, the executive here indisputably holds the right to obtain *benefits*, such as *bonuses* and *delay rentals*, in which the non-executive has absolutely no interest.

*Id*. at 83 (emphasis added).

Finding the existence of a fact issue precluding judgment, *KCM Financial* described that, if proven, the evidence supported the inference that the executive had negotiated an artificially low royalty, and an unusually high bonus, with intention to minimize the economic benefits shared with the non-executive. *Id*. at 84. In short, the allegations suggested the executive had misappropriated what would have been a shared benefit (a market-rate royalty interest) and converted it into a benefit reserved only unto itself (an enhanced bonus), with the intent to diminish the value of the non-executive holder's royalty interest. As observed by *KCM Financial*, "[i]f proved, such conduct is the essence of self-dealing." *Id*. at 83.

Turning to the 1951 deed at issue, "benefits" appears alongside "bonuses" in the middle portion of the intended clause when describing future leases: "[G]rantee … [is] hereby given the right to collect any and all bonuses and benefits on any future oil and gas leases[.]" Similarly, the last portion of the same clause further provides a description of economic gains conveyed to grantee including: "bonuses, delay rentals, oil payments and all other rights and benefits which may be provided for in any oil and gas leases which grantee, heirs and assigns, have or may hereafter execute upon the above mentioned property[.]" Guided by *Hysaw* and *KCM Financial*, we conclude that "benefits" is being used throughout the instrument as a catch-all term representative of the economic benefits of mineral leases, but these benefits stand apart from the non-participatory royalty interest which was expressly reserved or excepted by other language. *Hysaw*, 483 S.W.3d at 13; *KCM Financial*, 457 S.W.3d at 83–84.

23

*The Four Corners of the Instrument*

Here, giving effect to all provisions, the grantors not only reserved or excepted "the non-participating1/8th royalty in and under said land," but also clarified how the reserved interest was distinguishable from the other interests which were expressly conveyed by earlier languages. Of note, the first and only time the term "royalty" is directly mentioned in the entirety of the instrument is within the provision describing what rights of the grantors' the conveyance shall not affect. By use of the well-understood description, "non-participating royalty," the language confirms that grantors Hamilton and Billie Roach reserved or excepted, as a free royalty, their entire royalty interest in the gross production of oil, gas, and other minerals to be carved out of the mineral fee estate. *See KCM Financial,* 457 S.W.3d at 75; *Lesley*, 352 S.W.3d at 487 ("The non-executive royalty interest owner owns an interest in the royalty when the executive leases the minerals."). Consistent with other clauses, however, the shall not affect clause further provides that the reserved interest does not carry with it the right to participate in the execution of, the bonus payable for, or the delay rentals to accrue under oil, gas, and mineral leases executed by grantee Holt. In this manner, the shall not affect language correlates with the conveyance of all but the royalty interest by re-stating that grantors shall have "no right to any bonuses, delay rentals, oil payments or other benefits under any oil, gas and mineral leases which have been made or which may hereafter be made by grantee, his heirs or assigns, upon said property."

*The Size of the Non-Participatory Royalty Interest*

To construe the size of the royalty interest, we are once again guided by *Hysaw*. In *Hysaw*, the Court explained that royalty interests may be conveyed or reserved "as a fixed fraction of total production (fractional royalty interest) or as a fraction of the total royalty interest (fraction of

royalty interest)." *Hysaw*, 483 S.W.3d at 9. "A fractional royalty interest conveys a fixed share of production and remains constant regardless of the amount of royalty contained in a subsequently negotiated oil and gas lease." *Id.* "In comparison, a fraction of royalty interest (as a percentage of production) varies in accordance with the size of the landowner's royalty in a mineral lease and is calculated by multiplying the fraction in the royalty reservation by the royalty provided in the lease." *Id.* Importantly, the language used in the instrument determines whether the interest is fixed or floating. *Id.* at 11–13.

When a deed contains multiple fractions, disputes commonly arise over whether a conveyance or reservation reflects a fixed or floating royalty. *U.S. Shale Energy II, LLC v. Laborde Properties, L.P.*, 551 S.W.3d 148, 152 (Tex. 2018). These so-called double- and restated-fraction cases frequently involve multiples of 1/8, which was "the usual royalty provided in mineral leases" at the time deeds of a certain vintage were executed. *See id.*; *Hysaw*, 483 S.W.3d at 9. "The ubiquity of the 1/8 landowner royalty led many landowners to presume that the landowner royalty would remain 1/8 in perpetuity." *U.S. Shale Energy II, LLC*, 551 S.W.3d at 152; *Hysaw*, 483 S.W.3d at 10; *Luckel*, 819 S.W.2d at 462. Courts may recognize that, "the reality is that use of 1/8 (or a multiple of 1/8) in some instruments undoubtedly embodies the parties' expectation that a future lease will provide the typical 1/8th landowners' royalty with no intent to convey a fixed fraction of gross production." *U.S. Shale Energy II, LLC,* 551 S.W.3d at 152. In such cases, *Hysaw* cautions, however, that "the assumption that future royalties would remain 1/8 will not alter clear and unambiguous language that can otherwise be harmonized." *Hysaw*, 483 S.W.3d at 10.

Additionally, as further noted in *Hysaw*, a related issue that may be implicated in double-

25

fraction cases is the theory of "estate misconception." *Id*. This theory refers to a once-common misunderstanding that a landowner retained only 1/8 of the minerals in place after executing a mineral lease instead of a fee simple determinable with the possibility of reverter in the entirety. *Id*. The reality is that use of 1/8 (or a multiple of 1/8) in some instruments undoubtedly embodies "the parties' expectation that a future lease will provide the typical 1/8th landowners' royalty with no intent to convey a fixed fraction of gross production." *Id*.

Guided by *U.S. Shale Energy* and *Hysaw*, we conclude in this instance that the use of "7/8 leasing rights" in the intended clause followed by "1/8 non-participatory royalty rights" in the later clause show that the parties operated under both the presumption of the 1/8 royalty and the estate misconception. *U.S. Shale Energy II, LLC,* 551 S.W.3d at 152; *Hysaw*, 483 S.W.3d at 10. Again, as we earlier noted, no party asserts that grantors' intended to convey a fractional working interest of the size of 7/8. To be consistent and cohesive, we similarly conclude that the fractional descriptor of 1/8 was not used to describe a fractional share of 1/8 but rather as a proxy for the usual and customary royalty of the deed's era. Construing all language, we conclude that the 1951 deed conveyed the leasing rights, bonuses, delay rentals, and development rights, in their entirety, but reserved the *entire* non-participatory royalty as a floating royalty (rather than a fixed fraction or fixed royalty) in favor of grantors. Accordingly, we conclude that the trial court erred in granting the Holt heirs motion for partial summary judgment, while denying WTX's cross motion for partial summary judgment.

*Attorney's Fees*

Finally, as a related sub-issue, WTX contends the trial court erred in awarding attorney's fees to the Holt heirs under the Declaratory Judgments Act because the award was based on the

26

trial court's grant of summary judgment in their favor on the construction of the deed. It is well recognized that a trial court may exercise its discretion in awarding attorney's fees in any proceeding brought under the Declaratory Judgments Act. *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 37.009); *Oake v. Collin County,* 692 S.W.2d 454, 455 (Tex. 1985). The trial court's discretion, however, is "subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Id*. at 21. Having reversed the trial court's partial summary judgment, we also reverse the court's award of attorney's fees and remand the matter to the trial court to reconsider what award of attorney's fees, if any, is appropriate. *See Neeley v. West Orange-Cove Consol. Indep. Sch. Dist*., 176 S.W.3d 746, 799 (Tex. 2005).

We sustain WTX's single issue.

## CONCLUSION

For the reasons stated, we hold that the 1951 deed did not convey the royalty right, but instead, reserved grantors' floating non-participatory royalty interest. Because the deed unambiguously reserved the royalty interest, we hold that the trial court erroneously granted a partial summary judgment in favor of the Holt heirs and awarded attorney's fees, among other relief. Accordingly, we reverse the partial summary judgment of the trial court and render partial judgment in favor of WTX and declare that grantors' royalty right was not conveyed by the 1951 deed. In light of our decision, we remand the cause to the trial court to determine WTX's remedy and for reconsideration of an award, if any, of attorney's fees.

GINA M. PALAFOX, Justice

January 8, 2020

27

Before Rodriguez, J., Palafox, J., and McClure, C.J. (Senior Judge)
McClure, C.J. (Senior Judge), sitting by assignment